OPINION OF THE COURT
Wachtler, J.
The defendant, after being arrested and advised of his rights, requested the assistance of counsel. Ten minutes later, without having consulted an attorney, he was readvised of his rights, waived them and made a statement because, in the interim, the arresting officer had given him a fuller "explanation” or "understanding” by advising him of the strength of the case against him. A pretrial motion to suppress the confession was denied and, after the People had rested their case at trial, the defendant pleaded guilty to the murder count of an indictment charging him with murder and possession of a weapon.
On this appeal the defendant claims that the confession was obtained in violation of standards established in Miranda v Arizona (384 US 436) and thus should have been suppressed. He claims that the Miranda case establishes a per se rule prohibiting the police from resuming the interrogation, in the absence of counsel, once the defendant has requested an attorney’s assistance. In the alternative he claims that the relinquishment of his rights was not voluntary, under Miranda standards, because the arresting officer disregarded his request for counsel and engaged in conduct which undermined, and was calculated to undermine, his decision to consult an attorney before answering questions. The People, in addition to disputing these points, urge that the denial of the motion, if erroneous, was harmless in light of the other evidence of defendant’s guilt presented at trial prior to his plea of guilty.
On June 16, 1974 Earl Stokes was shot to death in a Manhattan apartment. Approximately one week later (June 24) a New York City police officer, Detective Campbell, arrested the defendant for the killing. At the time of the arrest a handgun, found in the defendant’s room, was also seized. Detective Campbell took the defendant to the police station and, before advising him of his rights, asked the defendant if he was willing to talk to the District Attorney. The defendant said that he was. The officer then called an Assistant District *370 Attorney who came to the station house accompanied by a stenographer. At 8:33 p.m. the defendant was taken before the prosecutor who advised him of his rights for the first time. When the defendant was informed of his right to have an attorney present during the questioning, he requested the assistance of counsel. The questioning was terminated and the defendant was taken from the room. Nothing, however, was done to assist the defendant in obtaining counsel. Instead Detective Campbell asked the prosecutor not to leave because he was going to speak to the defendant again.
As Detective Campbell was escorting the defendant from the interrogation room they passed the defendant’s girlfriend who was proceeding toward the room. Then, according to the officer’s testimony at the hearing, "I asked Mr. Grant why he agreed for the District Attorney to come down, and when he came down he didn’t * * * now he doesn’t want to speak to him, and I also explained to him that we had several witnesses against him, one being his girlfriend. There were two others that were playing cards at the scene, and I explained this to him. At this point he said that he wants to go see the District Attorney, he wants to speak to the District Attorney.”
At 8:47 p.m. the defendant reappeared before the prosecutor and was readvised of his rights. When he was asked whether he was willing to answer questions without the presence of a lawyer the defendant responded "Yes, I’m willing to answer questions”. The questioning continued as follows:
"Q. You indicated to me before you didn’t want to talk to me without a lawyer.
"A. That’s because I didn’t fully understand.
"Q. Do you understand what I just said to you now?
"A. I understand.
"Q. Are you willing to talk to me even though you told me before you didn’t want to talk to me.
"A. I didn’t understand and the detective explained to me.
"Q. Did the detective explain anything different to you than I just explained.
"A. Not exactly, no. More or less what he said confirms what you said, but just that I didn’t have the right knowledge of it.”
Thus within approximately 10 minutes after requesting an attorney’s assistance, the defendant waived his rights and confessed to the killing.
*371 At the conclusion of the suppression hearing the court held the confession admissible on the ground that the defendant had knowingly and voluntarily waived his rights. Ruling from the Bench the court stated that the prosecutor had properly terminated the questioning when the defendant requested the assistance of counsel. The court held, however, that questioning could resume if the defendant changed his mind provided that did "not come about through coercion or abuse of official power.” With respect to the comments made by Detective Campbell which led the defendant to waive the rights he had previously asserted the court concluded "that there was no coercive interrogation, that there were no threats, that there were no specific promises or inducements of any kind other than an opportunity for Mr. Grant to reconsider his position.”
At trial the People submitted the confession in evidence and called three eyewitnesses who identified the defendant as the killer. The prosecutor also called a ballistics expert who testified that a bullet found under the victim’s body was fired from the gun taken from the defendant’s room. When the People rested the defendant offered to change his plea and, as noted, pleaded guilty to the murder count of the indictment. He was sentenced to 18 years to life imprisonment.
The Appellate Division affirmed, without opinion. Two Justices concurred in result holding that the confession should have been suppressed but that the error was harmless considering the other evidence submitted by the People at the aborted trial (59 AD2d 661).
In the Miranda case the Supreme Court adopted "safeguards” to insure that statements obtained as a result of custodial interrogation are "truly the product of free choice” (Miranda v Arizona, supra, p 457). It is also basic, but important to emphasize at the outset in this case, that if the authorities do not observe these safeguards the resulting statement is not admissible in evidence even though it may not be said "to have been involuntary in traditional terms” (Miranda v Arizona, supra, p 457; Michigan v Tucker, 417 US 433, 445; Michigan v Mosley, 423 US 96, 99-100).
In Miranda the court established two different types of safeguards. First it prescribed the now familiar Miranda warnings which the authorities must give to all persons held in custody before interrogation commences (see Miranda v Arizona, supra, p 444). Secondly the court established the less familiar procedures the police must follow if an individual *372 asserts his rights by requesting counsel or electing to remain silent.
With respect to the right to remain silent the court states: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked” (Miranda v Arizona, supra, pp 473-474). In a footnote, however, the court suggested that "If an individual indicates his desire to remain silent, but has an attorney present, there may be some circumstances in which further questioning would be permissible. In the absence of evidence of overhearing, statements then made in the presence of counsel might be free of the compelling influence of the interrogation process and might fairly be construed as a waiver of the privilege for purposes of these statements” (Miranda v Arizona, supra, p 474, n 44).
With respect to a request for counsel the court was apparently more specific: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent” (Miranda v Arizona, supra, p 474 [emphasis added]).
In Miranda and the companion cases the court suppressed all the statements because it found that none of the defendants had been given adequate warnings. It thus had no occasion to consider the application of the procedures it had indicated should be followed when a defendant asserts his rights. It was not until the recent case of Michigan v Mosley (423 US 96, supra) that the court was presented with a claim that the police had violated the second level safeguards by renewing interrogation after the defendant asserted his rights.
In Mosley the defendant was arrested for two robberies and was advised of his rights. He stated that he did not want to answer any questions about the robberies but he did not *373 request an attorney. The interrogation was immediately terminated. Two hours later, however, another officer investigating an unrelated murder advised the defendant of his rights and questioned him about the homicide. On this occasion the defendant made a statement implicating himself in the homicide. The State’s highest court held this statement inadmissible under Miranda, but the United States Supreme Court reversed.
Although Miranda (supra, p 474) states that "the interrogation must cease” when the defendant indicates that he wishes to remain silent, the Supreme Court noted in Mosley that it "does not state under what circumstances, if any, a resumption of questioning is permissible” (Michigan v Mosley, supra, p 101). The court indicated that the passage could be "literally read” in various ways. It could, for instance, "be read to create a per se proscription of indefinite duration” prohibiting any further questioning of the defendant on any subject, by any officer, at any time or place; or it could simply mean that the police must immediately stop the questioning, but could resume the interrogation "after a momentary respite” (Michigan v Mosley, supra, pp 101-102).
Rejecting the literal interpretations the court held instead that "the critical safeguard identified in the passage” was the individuals’ right "to cut off the questioning” so as to control the timing, subjects and duration of the interrogation, all of which serves to counteract "the coercive pressures of the custodial setting” (Michigan v Mosley, supra, pp 103-104). Thus the court concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning’ was 'scrupulously honored’ ” (Michigan v Mosley, supra, p 104). Under the circumstances the court held that the police had respected that right in Mosley’s case. The court noted that when the defendant informed the first officer that he did not want to discuss the robberies the officer "immediately ceased the interrogation and did not try either to resume the questioning or in any way persuade Mosley to reconsider his position * * * This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here *374 immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation” (Michigan v Mosley, supra, pp 104-106).
The court’s analysis in Mosley shows that when the defendant waives his Miranda rights after he has initially asserted the right to remain silent, the admissibility of his statement does not depend solely on the voluntariness of the waiver "in traditional terms” (Miranda v Arizona, supra, p 457; Michigan v Mosley, supra, pp 99-100). The court must first determine whether the police complied with the second level procedures established in Miranda, by "scrupulously honoring” the defendant’s right to "cut off the questioning”. This distinction was underscored by Justice White’s concurring opinion in which he urged that the voluntariness of the waiver should be the only consideration once the defendant has been advised of his rights (Michigan v Mosley, supra, pp 107-111).
In Mosley of course the court was not concerned with the procedure the police must follow when a defendant asserts his right to counsel (see Michigan v Mosley, supra, p 101, n 7). However in response to the dissent’s suggestion that the questioning should not resume until an attorney appears when the defendant indicates his desire to remain silent the majority observed that "clearly the Court in Miranda imposed no such requirement, for it distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that the 'interrogation must cease until an attorney is present’ only '[i]f the individual states that he wants an attorney’ ” (Michigan v Mosley, supra, p 104, n 10). Similarly in his concurring opinion Justice White noted that when the Miranda court "wanted to create a per se rule against further interrogation after assertion of a right, it knew how to do so. The Court there said '[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present’ ” (Michigan v Mosley, supra, pp 109-110). The dissent in Mosley also observed that the majority "apparently proscribes resuming questioning until counsel is present if an accused has exercised the right to have an attorney present at questioning” (Michigan v Mosley, supra, p 116, n 4 [Brennan, J., dissenting]).
In the case now before us the defendant, relying on these comments, urges that when a person in custody requests *375 counsel — as opposed to merely asserting his right to remain silent — Miranda does indeed impose a per se rule prohibiting the police from resuming questioning until an attorney is present. The People on the other hand cite cases from other jurisdictions, apparently representing the weight of authority, which have rejected this view on the theory that the Mosley holding evidences a dissatisfaction with per se rules and signifies a departure from the literal wording of the Miranda decision.[1]
Semantics aside there would appear to be cogent reasons for distinguishing a request for counsel from a mere refusal to answer questions. As Justice White suggests in his concurring opinion in Mosley: "the reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities’ insistence to make a statement without counsel’s presence may properly be viewed with skepticism” (Michigan v Mosley, supra, p 110, n 2; see, also, Brewer v Williams, 430 US 387, 405, n 10).
In this case however there is no need to reach or resolve the broad question as to whether Miranda establishes a strict "safeguard” or merely a general rule, with exceptions, requiring the police to discontinue questioning until an attorney arrives in those cases where the defendant has requested the assistance of counsel. Even if the authorities may resume questioning in the absence of counsel after the defendant has requested an attorney’s assistance — as they may when the *376 defendant has merely asserted the right to remain silent— Miranda would at least require that they "scrupulously honor” the request for counsel before they continue the interrogation (Michigan v Mosley, supra; see, also, People v Jackson, 41 NY2d 146; People v Buxton, 44 NY2d 33). And in this case, as in our earlier decisions in Jackson and Buxton, it is sufficient to note that this requirement has not been met.
Here as noted, little more than 10 minutes elapsed between the defendant’s assertion of his right to counsel and the second interrogation by the Assistant District Attorney. In the interim the authorities did not afford the defendant an opportunity to obtain the assistance of counsel. On the contrary the arresting officer immediately questioned the defendant’s judgment by asking him why he had refused to talk with the prosecutor when there were so many witnesses against him. Although the officer did not, in so many words, advise the defendant to change his mind, the officer’s statement was at least calculated "to persuade [the defendant] to reconsider his position” (Michigan v Mosley, supra, p 104), and it almost immediately had that effect. Indeed there is some question as to whether the defendant was even given a "momentary respite” from interrogation following his request for counsel siiice the officer’s statement itself was likely to, and soon did, prompt the defendant to make incriminating statements (see, e.g., Combs v Wingo, 465 F2d 96, supra; Commonwealth v Padgett, 428 Pa 229; cf. Brewer v Williams, 430 US 387, supra; People v Jackson, supra).
In prior decisions we have held that the police cannot be said to have respected the defendant’s request for counsel when they simply readvise the defendant of his rights after he has been transported to the station house (People v Buxton, supra), or when they confront him with the tearful mother of a codefendant, although they had previously afforded him an opportunity to attempt to reach an attorney and subsequently readvised him of his rights (People v Jackson, supra). Here the arresting officer’s conduct was completely inconsistent with the defendant’s request because he took no steps to afford the defendant an opportunity to obtain an attorney’s assistance, and, in fact, immediately made comments which undermined the defendant’s decision to consult an attorney. In addition, unlike the circumstances in Mosley, here there was no significant break in the interrogation, and no change of parties, place or subject matter of the interrogation (see Michigan v *377 Mosley, supra, p 104). In short on this record it cannot be said that the authorities "scrupulously honored” the defendant’s request for counsel before resuming the interrogation and the confession should have been suppressed.
As indicated the People argue, in the alternative, that if the denial of the motion to suppress was erroneous it should be considered harmless error in light of the other evidence submitted at trial before the defendant pleaded guilty. The application of the harmless error rule to a conviction based on a guilty plea raises novel questions.
CPL 710.70 (subd 2) provides that "An order finally denying a motion to suppress evidence may be reviewed upon an appeal from an ensuing judgment of conviction notwithstanding the fact that such a judgment is entered upon a plea of guilty”. But if the appellate court finds that the denial of the motion was erroneous the statute does not indicate what should be the disposition of the appeal when the conviction is based on a plea instead of a verdict. In the past we have uniformly reversed and vacated the plea under these circumstances (see, e.g., People v Rothenberg, 20 NY2d 35; People v Brown, 24 NY2d 421; People v Hendricks, 25 NY2d 129; People v Abronovitz, 31 NY2d 160; People v Stokes, 32 NY2d 202; People v S & L Processing Lab, 33 NY2d 851; People v Williams, 37 NY2d 206; People v Sanchez, 38 NY2d 72; People v Chapple, 38 NY2d 112; People v Hobson, 39 NY2d 479; People v Ramos, 40 NY2d 610). The availability or lack of other evidence of the defendant’s guilt was only considered material in determining the disposition of the accusatory instrument following the reversal. If there was no indication that the People possessed other evidence admissible at trial, the accusatory instrument would be dismissed (see, e.g., People v Brown, supra; People v Hendricks, supra; People v Abronovitz, supra; People v Stokes, supra; People v S & L Processing Lab, supra; People v Sanchez, supra). But if it appeared that there was other evidence of the defendant’s guilt available to the prosecution we would simply reverse and remit for further proceedings without dismissing the accusatory instrument (see, e.g., People v Rothenberg, supra; People v Williams, supra; People v Chapple, supra; People v Hobson, supra; People v Ramos, supra). In no case where the defendant has pleaded guilty have we held that an erroneous denial of a pretrial motion to suppress was harmless error (cf. People v Ramos, supra, pp 618-619).
*378 Harmless error rules were originally enacted to relieve the courts and the public generally of the needless expense of retrying cases "in which the result would be the same after the error had been corrected” (Mause, Harmless Constitutional Error: The Implications of Chapman v. California, 53 Minn L Rev 519; Kotteakos v United States, 328 US 750). They were designed to change the common-law rule which required reversal if there had been any error at trial, however slight (Mause, op. cit, p 519). Because harmless error rules were formulated to review trial verdicts, they are difficult to apply to guilty pleas.
Harmless error rules generally involve consideration of two factors. "The first of such factors is the quantum and nature of proof of the defendant’s guilt if the error in question were to be wholly excised. The second is the causal effect which it is judged that the particular error may nonetheless have had on the actual verdict” (People v Crimmins, 36 NY2d 230, 240). In the typical case of a conviction based on a plea, neither of these factors can be properly evaluated, particularly when the error involves an improper denial of a pretrial motion to suppress. Without a trial there will be little if any evidence in the record, apart from the proof which should have been excluded. And without a verdict, there is no predicate for determining what causal effect the error had or might have had upon the fact finder.
This case of course is not typical because here the defendant did not plead guilty until after the People had rested their case at trial. Perhaps it could be said that here the court could evaluate the quantum and nature of the proof of the defendant’s guilt by reviewing the People’s case, as if the defendant had simply rested without submitting any evidence at the trial.[2] This type of analysis however would only aid in considering the first factor mentioned above.
It is consideration of the second factor which is most important in this case, because here the error was of constitutional dimension. As we noted in Crimmins, "It appears that it is the latter consideration which is critical in the application of the Supreme Court test as to harmlessness of constitutional error. Thus, however overwhelming may be the quantum and nature of other proof, the error is not harmless under the Federal *379 test if 'there is a reasonable possibility that the * * * [error] might have contributed to the conviction’ ” (People v Crimmins, supra, pp 240-241). When the conviction is based on a plea — instead of a verdict — the question must at least be reformulated to determine whether there is a reasonable possibility that the error contributed to the plea (cf. People v Ramos, 40 NY2d 610, 618-619, supra).
This question however is one which an appellate court is rarely equipped to answer without resorting to speculation. Unlike a verdict, which must necessarily be based exclusively on the evidence submitted at trial, a defendant’s decision to plead guilty may be based on any factor inside or outside the record. Thus a conviction based on a plea of guilty simply reflects the fact that for some reason, sufficient to the defendant, he decided to waive his trial rights (see, e.g., North Carolina v Alford, 400 US 25; People v Serrano, 15 NY2d 304, 310). His decision of course may be based on knowledge of the People’s case but, perhaps more frequently, it is based on ignorance and fear of what the prosecutor may know about this, or other offenses. A defendant may also decide to plead because of feelings of guilt, or merely because he does not want to risk a conviction for a higher offense or wishes to spare his family or himself the ordeal of a trial, although he may be firmly convinced of his own innocence (see, e.g., North Carolina v Alford, supra; People v Serrano, supra). And of course he may decide to plead and take an appeal because he believes that he cannot succeed at trial unless certain evidence is suppressed (see Lefkowitz v Newsome, 420 US 283, 292).
The People urge that on the record it can be determined that the denial of the motion played no part in the defendant’s decision to plead because he did not plead guilty immediately after the motion was denied, and only did so after the People had submitted their proof at trial. But the proof at trial included the confession, and we cannot rule out the possibility that the defendant concluded that he could not prevail in the face of all the evidence. Notably, at the time of plea he did not waive his right to appeal and have the confession suppressed and a new trial granted (see People v Williams, 36 NY2d 829).
In sum, when a conviction is based on a plea of guilty an appellate court will rarely, if ever, be able to determine whether an erroneous denial of a motion to suppress contrib *380 uted to the defendant’s decision, unless at the time of the plea he states or reveals his reason for pleading guilty. This is especially true when the defendant has unsuccessfully sought to suppress a confession (People v Ramos, supra, pp 618-619).
Accordingly, the order of the Appellate Division should be reversed, the plea vacated and the motion to suppress granted.

. For cases recognizing a per se rule (see, e.g., State v Boone, 220 Kan 758; State v Boggs, 16 Wash App 682; State v Haynes, 16 Wash App 778; United States v Priest, 409 F2d 491; United States v De Leon, 412 F Supp 89; United States v Jakakas, 423 F Supp 564, 569; Combs v Wingo, 465 F2d 96; United States ex rel. Williams v Twomey, 467 F2d 1248; United States v Blair, 470 F2d 331, cert den 411 US 908; United States v Kinsman, 540 F2d 1017, 1018-1019).
For cases rejecting a per se rule (see e.g., State v Grange, 25 Ariz App 290; State v Green, 91 NM 207; Nash v State, 477 SW2d 557 [Tex], cert den 409 US 887; United States v Barnawell, 341 F Supp 619; United States v Grady, 423 F2d 1091; United States v Hodge, 487 F2d 945; Biddy v Diamond, 516 F2d 118, cert den 425 US 950; United States v Womack, 542 F2d 1047; United States v Grant, 549 F2d 942, 945, n 4; United States v Charlton, 565 F2d 86).

. It might, however, be more realistic to recognize that the record is incomplete since it does not contain any countervailing proof that the defendant might have offered if he had not taken the plea.