THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAFAEL APONTE and RICHARD VALENTINE, Appellants.

Second Department, July 9, 1979

### APPEARANCES OF COUNSEL

*William E. Hellerstein (Asher H. Miller* of counsel), for Rafael Aponte, appellant.

*Harry Z. Berger* for Richard Valentine, appellant.

*Eugene Gold, District Attorney (William Gurin* of counsel), for respondent.

### OPINION OF THE COURT

SHAPIRO, J.

■ We hold that defendant Aponte's conviction of manslaughter in the first degree and criminal possession of a weapon in the second degree, after a jury trial, should be reversed and the indictment as against him dismissed because his statement given to the police some three hours after he requested counsel, and his ensuing statement to an Assistant District Attorney, should have been suppressed. Absent such statements there was insufficient evidence presented at the trial to establish his commission of the alleged crimes.

■ We further hold that codefendant Valentine's conviction of manslaughter in the second degree and criminal possession of a weapon in the third degree should be reversed on the law, the facts and as a matter of discretion in the interest of justice, and the indictment against him dismissed.

### THE FACTS

On August 26, 1976, at about 9:50 P.M., William Stewart was shot to death on Cleveland Street near its intersection with

Glenmore Avenue, Brooklyn, New York. One month later, on September 25, 1976, Aponte was arrested at 7:15 P.M. and taken to the 75th Precinct in Brooklyn. There, at about 8:00 P.M., he was advised of his *Miranda* rights and he refused to make a statement. Between 8:00 and 8:30 P.M. he was advised by the police officer that "he was going to be viewed [through a see-through mirror] by persons * * * who knew him before as being at the area" (i.e., the scene of the shooting). Sometime between 8:30 and 9:00 P.M. he was told that he had been identified by those persons as being at the scene. At 10:00 P.M. he was transferred to the 69th Precinct where, at about 10:15 P.M., he again received the *Miranda* warnings and again declined to make a statement. At about 10:30 P.M. an Assistant District Attorney arrived at the 69th Precinct and advised Aponte of his *Miranda* rights before attempting to question him. Aponte said that he did not want to speak to him and that he *"would like to have a lawyer first."* Thereupon, the Assistant District Attorney terminated the interview and left the precinct. He gave no instructions to the police with respect to obtaining an attorney for Aponte.

Some three hours later Aponte asked to speak to the detective who had arrested him, and told him he was ready to make a statement. Up to that time the police made no attempt to obtain a lawyer for Aponte nor (apparently) had they asked him if he had a lawyer whom he would want to call. He was again advised of his *Miranda* rights and this time he made a statement about the incident. He then asked that his cousin, defendant Richard Valentine, who had been with him at the scene of the incident and who had voluntarily surrendered to the police at 11:00 P.M. (Sept. 25), be brought to him. The police produced Valentine who was then informed by Aponte that he had made a statement to the police and that Valentine should do the same.[1] Valentine then did so without being told what Aponte had said.

The Assistant District Attorney was called to the precinct and both defendants made statements to him, similar to those they had given to the police, after being advised by the Assistant District Attorney of their *Miranda* rights, and waiving them. Redacted transcripts of the statements given to the Assistant District Attorney were admitted into evidence both at the *Huntley* hearing and at the trial.

---

1. Up to that time Valentine had refused to make any statement to the police about the incident.

APONTE'S STATEMENT TO THE ASSISTANT DISTRICT ATTORNEY

"We had just come out of the movies. And it was still kind of early. So we rode a couple of hours [in Aponte's car] and we decided that we were going to * * * get something to get high on * * * We went to Glenmore and Jerome [Avenues, in East New York] and we inquired for a few things. We left the area and we started walking toward my car * * * As I crossed the street, these two Black fellows approached us from behind * * * The one that was to my right, he pulled out a gun and he said, don't turn around * * * I kept on walking. We got to the corner. He put the gun to my back * * * And he told me not to look around. He put the gun to the back of my neck and he cocked it. There was a hallway there. And he told us to go in there and we went in there and they said, give us all your money and don't do anything or we will blow your brains out. He asked me, how much money I had. And I said, I don't know. I went into my pockets just to get my money. And he pushed me. He said, if you come out with a gun, I will kill you * * * [H]e took the money that I had in my pockets * * * The other fellow was doing the same thing to Ritchie [Valentine] * * * They were arguing because they said there wasn't enough money.

"I had some money but I left most of it in my car * * * This other fellow he kept on pumping and insisting we had more money. He pulled my socks down. I was very humiliated, very sad, very nervous * * * My car was right there on the corner. They told us to keep walking and I didn't want to go to the car because I was afraid they might try to rob the rest of my money and my [Human Resources Special Administration] shield * * * Then they told us to keep going. They kept on following us. We turned the corner and went down the block * * * We walked around a little while and finally we came back around the block and they were gone.

"We walked to my car. I had a gun in my car. We were deciding what to do. Ritchie suggested we go to the police. And I said, maybe we should. And then I said, they are not going to do anything because my girlfriend's apartment had been robbed. My mother had been robbed. It seemed like the same thing was happening to me. We decided not to go to the police. So Ritchie suggested, just get out of here * * * My mother's home was on Jerome [Avenue]. I was very nervous. So I suggested we go to my mother's house. We turned down

Cleveland Street and we observed the two guys that had just finished robbing us * * *

"I stopped the car [double-parking it] next to a van that was parked there * * * The fellow * * * was approaching the car and he put his hand in his pocket or in his * * * waistband * * * I got very cautious and I placed the gun on the floor of the car. He came up to the car and he said, what do you want. And I said * * * [w]e want our money back.

"At that time he started going for the piece. And it must have gotten caught in his waistband. And I picked up mine. And his partner started running. I said, watch him, I figured they had gone * * * When the fellow ran past the van, I figured that he was going to keep running, but he turned and he pulled the gun and I fired * * * [j]ust once * * * It seems like he was going to go past the van and when he pulled out the gun, he spun around with the gun and I fired one shot. He grabbed his side and he said, oh, my God * * * [T]hen I said, let's get out of here. I didn't believe what had happened * * *

"He [had been] running. He was at the car and he was pulling out the gun. It was when I saw him pulling out the gun. It must have gotten caught in his waistband. So I took my gun out * * * and I pointed it. I didn't fire. All I wanted was my money back * * * [H]e turned and started running towards the sidewalk * * * When he got [past] the car, he spun around. And he had the gun in his hand * * * And he turned, aimed it at us, and I just fired."

In response to questioning, he stated that at the time the engine of his automobile was still running and that it was in neutral. He was asked whether there was anything stopping him from driving away at that time and he answered "No." He guessed that he could have driven away but stated: "I wasn't thinking, I didn't know what I was thinking about when his friend ran towards the back of the car. I figured maybe he was coming on the other side because they were very, very bold. There was so much in my mind. I was confused. I wasn't really thinking at that time. I really wasn't aware. I didn't even know that the car was on. I was intent on the situation. I didn't want to get shot. It happened so fast. I didn't think I really had an opportunity to drive away * * * I didn't plan it. I didn't plan on firing, it just happened."

He stated that the gun was a .22 Magnum; that he had had it for two months and had paid $150 for it; and that he did not have a permit for it. In response to the question as to

where he had obtained it, he answered, "I would rather not say."

After defendants left the scene, he threw the gun away into "the Mill Basin by the creek" behind the "pink houses." He had never used the gun before. He stated, "I just happened to have it with me that day because I had quite a bit of money on me. It was just in the car."

### VALENTINE'S STATEMENT TO THE ASSISTANT DISTRICT ATTORNEY

"[M]e and Ralph Aponte, we went down to score something to get high with. [We went t]o Jerome Avenue and Glenmore * * * where everybody hangs out, so we didn't park there * * * [W]e parked the car maybe half a block, a block and a half down * * * I left my wallet in the car and Ralph left his wallet in the car. And we closed the car and we scored.

"On the way back, there were these two colored guys on the corner * * * They got close to us * * * I noticed one of them had his hands in his pocket. It was too late for us to turn back. As soon as we got to the corner, the guy took his gun out and he stuck it in our back and he said, don't move * * * We were outside while the one guy held the gun on us this other guy he searched us. Before he searched us, he said, gimme your money. I took out two dollars and when he saw that he looked in my pocket and he saw ten dollars. He looked at my ring. They searched Ralph. He didn't have nothing. Then this other guy, he said, is this all you got. And we said, that's all we got * * * They looked at each other and then the other guy started searching us * * * He was pretty pissed off. We should give it back to them. And the other guy said, no, he said walk. He had the gun on us. He said, don't turn around. We started walking down the block and Ralph said, don't turn around because they got a gun * * *

"We got to the car. And the first thing we were saying was we should look for these guys. We looked and we didn't find them. Then we were going to forget it."

They went into the Aponte car. Aponte drove with Valentine sitting next to him. Then "we saw them * * * [S]o we backed up the car. As we were going down, I said, don't let them come down. We will get our money back. We backed up the car and they saw us. They went back by *[sic]*. When we pulled up, they were coming towards us * * * [So] Ralph, he

said, you the guys that just ripped us off. Then the guy went in his pocket and I think he was going to use the gun and Ralph shot him * * * [Ralph fired w]ith his right hand. He had it in his seat. He just took it out and he fired. I didn't know he was going to fire. When he shot the guy, the guy just held his side. Then the other guy ran * * * I [had been] looking at the person, like this. I didn't see the piece. I was looking at the person [towards the right] * * * That's when I heard the shot. The thing happened so fast".

There was this colloquy:

"[The Assistant District Attorney]: When you were driving up to these guys, you were driving up to them because you wanted to get your money back?

"Answer: Yeah, I was going to go there and use my hands. Ralph kept saying, don't do it, he's got a piece. I said, I better be cool. I didn't want a bullet in my back."

### THE HUNTLEY HEARING

Defendants, having moved for suppression of their statements, were granted a *Huntley* hearing (see *People v Huntley,* 15 NY2d 72). Detective Lasky and the Assistant District Attorney were the only two witnesses. Lasky testified, on re-cross-examination, that between 7:30 and 8:30 P.M. there had been a "show-up" at which two individuals observed Aponte in an adjoining room, through a see-through mirror. Lasky had told Aponte that he was going to be observed by two men: "I told him that he was going to be viewed by persons who know him, who knew him before as being at the area." These two individuals separately looked through the mirror and identified Aponte. They had come to the precinct in the company of the police officers and Lasky had "discussed the matter" with them. He recalled "asking each one separately, do they remember and can they identify the persons, and they said, yes, they have seen them before many times. They know who they are by their faces and by their appearance." Sometime between 8:30 and 9:00 P.M. Lasky told Aponte that these individuals had identified him. He did not tell Aponte who they were. Lasky also told the Assistant District Attorney of this identification when he first requested him to come to the precinct.

There was a further "show-up" in which the same two individuals identified Valentine at about 11:30 P.M., and Lasky advised Valentine that he had been so identified.

Implicit in Lasky's testimony is the inference that from the time the Assistant District Attorney left Aponte's presence at about 10:30 P.M. (after Aponte had told the Assistant District Attorney that he wanted a lawyer) there was no further questioning of Aponte. However, there were apparently some further *conversations* with Aponte.[2] In any event, according to Lasky, at about 1:40 A.M. (3 hours and 10 minutes after the Assistant District Attorney left) Aponte, without solicitation, told Lasky that he was ready to make a statement, which he did after Lasky once again read his rights to him. Then Valentine (at Aponte's request) was presented to Aponte who told Valentine to also make a statement. After Valentine complied, the Assistant District Attorney was called to return to the precinct. In Lasky's presence, the Assistant District Attorney separately gave the *Miranda* warnings to Aponte and Valentine, and both defendants (in the absence of each other) then gave a statement of the incident to the Assistant District Attorney.

### THE TRIAL COURT'S ORAL DECISION ON THE HUNTLEY HEARING

The trial court indicated that it was troubled by the fact that there was no follow up by either the Assistant District Attorney or the police to Aponte's 10:30 P.M. request for counsel. The court pointed out that Lasky "was an experienced detective and he was present, and [the Assistant District Attorney] might have necessarily relied upon the man's experience as a police officer, and so on, to feel that he didn't need to advise him." The court stated that it "felt that there was some obligation on the part of [the Assistant District Attorney] at the time that he left the station house to say to the officers, 'Hey, you know, he says that he wants a lawyer * * * You ought to ask him who his lawyer is and ask him if he wants to get him.'" The court, however, concluded that there was no inherent impropriety because "there were matters which took place subsequently, the coming and going of people in and out of the station house[3] [and] there is no

2. It would appear that since Valentine had surrendered to the police at about 11:00 P.M., and since Aponte requested that Valentine be brought to his presence at about 1:40 A.M., there must have been *some* conversations between Aponte and the police after 11:00 P.M. in which the police told Aponte that Valentine was in custody.

3. The court was apparently referring to the fact that after Lasky was informed by the 75th Precinct police that Valentine had surrendered to them at 11:00 P.M., Lasky

indication in the record, anyway, that anybody leaned on either one of these defendants to the extent that they coerced [them] or frightened [them] or in some way conned them, you might say, into making a statement."

The court continued: "I do feel that if anything did happen, it might necessarily have been in the ordinary course of police work, and while it may have affected the defendants, it did not and it was not done with the intention of deliberately obtaining from them statements in violation of their Constitutional rights."

With reference to the impropriety of the "show-up" (since, clearly, a "lineup" would have been appropriate [see *People v Brown,* 20 NY2d 238]) and the possibility that Aponte's statement might have been induced by the information given to him by the police that he had been identified in the "show-up", the court said: "I think that the police officers had a right to indicate this to the defendants so that the defendants probably knew that they were being viewed * * * And I believe that they finally decided, 'What was the use'. And they decided to make the statements." The court concluded that the determinative factors were that the transcript of the Assistant District Attorney's rendition of the *Miranda* warnings to both defendants "clearly indicated to the defendants that they had no olbigation to speak, that they had every right to maintain their positions previously taken if they did not want to speak * * * [and] that no one used any undue pressures, coercion or what not or duress or trickery or ruse * * * on either of these two defendants in obtaining these statements from them * * * [C]onsequently, I am going to permit the statements, both taken by the police officer and by the Assistant District Attorney, into evidence."

### THE TRIAL

The only evidence connecting defendants to the homicide were the statements they gave to Detective Lasky and the Assistant District Attorney. Detective Lasky's testimony essentially consisted of a reading from his memo book of the statements made to him by the defendants. The Assistant District Attorney's testimony essentially consisted of the verbatim transcript of the statements he had taken from the

---

left the 69th Precinct, went to the 75th Precinct, and then accompanied Valentine back to the 69th Precinct where Aponte was being detained.

defendants. The latter statements were redacted, pursuant to stipulation. However, the court refused defendants' request to delete therefrom the reference in Aponte's statement to defendants' desire to "get something to get high on" and the reference in Valentine's statement that they "went down to score something to get high with." In his summation the prosecutor relied heavily on those facts to secure a conviction.[4]

The defendants produced no witnesses. After the prosecutor's summation, Aponte's counsel referred to the fact that the District Attorney's office had interviewed two alleged witnesses to the incident, West and Mack, the men who allegedly identified the defendants at the station house "show-up". He asserted that he had never been provided with the addresses of these witnesses nor did he know what their testimony would have been. He requested the court to instruct the jury that they could infer that the testimony of West and Mack would not be favorable to the prosecution. The prosecutor replied that the addresses of these witnesses were indicated on a DD-5 given to the defense attorneys and that they were "not witnesses under the control of the People." The prosecutor then announced that "with respect to Mack, he is at this point incarcerated. As of today, he was produced in this courthouse and would have been made available had counsel asked him for his production at any time." Aponte's counsel stated that that was the first time that he knew of Mack's presence in the courthouse.

The court denied Aponte's counsel's requested instruction because the addresses of these "witnesses" had been provided to the defense and because identification was not an issue, although the court stated that "it might have been appropriate for the Assistant District Attorney to say to you: 'By the way, gentlemen, before you rest, Mr. Mack is here if you want him.'"

### THE VERDICT AND SENTENCING

The jury convicted Aponte of manslaughter in the first

---

4. In the summation by the People, the following appears:

"According to Mr. Aponte, 'We had just come out of the movies. And it was still kind of early. So we rode a couple of hours. And we decided that we were going to be, you know, and get something to get high on.'

"*Draw your own conclusions, ladies and gentlemen.*

"And this is by Richard Valentine, 'Well, me and Ralph Aponte, we went down to score, to get something to get high with.'

"*Draw your own conclusions, ladies and gentlemen*" (emphasis supplied).

degree and criminal possession of a weapon in the second degree. Valentine was found guilty of manslaughter in the second degree and criminal possession of a weapon in the third degree. Thereafter, the court sentenced Aponte to concurrent terms of 0 to 12 years and 0 to 5 years for the convictions of manslaughter and weapon's possession, respectively. Valentine was sentenced to concurrent terms of 0 to 7 years and 0 to 4 years for the manslaughter and weapon's possession convictions, respectively. The trial court granted the defendants' motion for a stay of execution of the judgments pending appeal.

## THE LAW

### I

### THE ADMISSIBILITY OF APONTE'S STATEMENT TO THE POLICE AND TO THE ASSISTANT DISTRICT ATTORNEY

*Miranda* warnings were first given to Aponte by Detective Lasky at about 8:00 P.M. He declined to make a statement but did not then specifically request an attorney. At about 10:15 P.M. Detective Lasky again administered the warnings to Aponte, and Aponte again declined to talk. At 10:30 that evening, the Assistant District Attorney administered the warnings in Lasky's presence. Aponte for the third time declined to make a statement and, additionally, stated, in reply to the Assistant District Attorney's request whether he was "willing to answer my question without first speaking to a lawyer or having a lawyer present?", *"No, sir, I would like to have a lawyer first."*

Therefore, at 10:30 P.M., the Assistant District Attorney and Lasky, both of whom were apparently experienced in their respective professions, knew (or should have known) that an attorney would have to be produced for Aponte. At that point there were two duties imposed upon them: (1) that further interrogation be terminated; and (2) that Aponte's request for an attorney be complied with. Only the first of these duties was honored.

Since Aponte was in the custody of the police it was up to the police and the Assistant District Attorney, or either of them, to make arrangements to obtain counsel for him. Neither should be allowed to evade his duty by claiming that he thought the other would do so; nor can Detective Lasky be

excused because he became involved in the arrest and transportation of Valentine to his own precinct after 10:30 P.M., and with the paperwork involved in the forthcoming judicial proceedings. It is indeed possible to walk and chew gum at the same time.

We need not, in this case, grapple with the sticky question of whether there is or should be a per se rule prohibiting a suspect, after having initially made known his desire to have the assistance of counsel, from waiving that right (see the majority, concurring and dissenting opinions in *United States v Rodriguez-Gastelum,* 569 F2d 482, cert den 436 US 919; *People v Parker,* 84 Mich App 477; *Commonwealth v Watkins,* — Mass — [379 NE2d 1040]; *People v Buxton,* 44 NY2d 33, 37),[5] since the principle established in *People v Grant* (45 NY2d 366), *People v Munlin* (45 NY2d 427) and *People v Clark* (45 NY2d 432; all decided on July 13, 1978), make such a determination unnecessary.

In *People v Grant (supra,* p 377), the court stated: "it cannot be said that the authorities 'scrupulously honored' the defendant's request for counsel before resuming the interrogation and the confession should have been suppressed." There, the defendant, arrested for murder, had requested the assistance of counsel. Ten minutes later, without having consulted an attorney, he was readvised of his rights, waived them and made an inculpatory statement. In the interim "the arresting officer had given him a fuller 'explanation' or 'understanding' by advising him of the strength of the case against him" *(supra,* p 369). The court said (p 376): "Here the arresting officer's conduct was completely inconsistent with the defendant's request because *he took no steps to afford the defendant an opportunity to obtain an attorney's assistance, and, in fact, immediately made comments which undermined the defendant's decision to consult an attorney"* (emphasis supplied).

In *People v Clark* (45 NY2d 432, *supra),* the court held that statements made by defendant at a police station approxi-

---

5. The court in *People v Buxton (supra,* p 37), in dictum, stated: "The *Miranda* decision was designed to prevent further interrogation, and thus a statement is admissible if volunteered—even if an attorney is on the way". I do not interpret that as a conclusive rejection of the per se rule, since in the later case of *People v Munlin* (45 NY2d 427, 430-431), the same court stated that "there is no need in this case to determine whether *Miranda* establishes a per se rule prohibiting the police from renewing the interrogation in the absence of counsel once the defendant has requested an attorney." Thus, the issue is still open in this State.

mately one hour after he had informed a police officer that he did not wish to answer questions without the assistance of counsel were inadmissible. The court stated *(supra,* p 439): "With respect to the statements the defendant made at the police station the trial court found they were admissible because the defendant had not been coerced. However in view of the fact that the defendant had initially refused to answer questions without an attorney's assistance the admissiblity of these statements, made in the absence of counsel, does not depend solely on voluntariness in traditional terms. As noted in *People v Grant* (45 NY2d 366, decided herewith), *Miranda* imposes additional obligations on the police when the defendant asserts his rights. And even if under these circumstances the police were not absolutely prohibited from renewing the questioning in the absence of counsel—a question we need not decide in this case—they must at least scrupulously honor the defendant's right to counsel before continuing the interrogation *(People v Grant, supra)."*

In *People v Munlin* (45 NY2d 427, 430-431, *supra),* the court stated: "The principles applicable to this appeal are discussed in *People v Grant* (45 NY2d 366, decided herewith). Here it is sufficient to emphasize that although the police advised the defendant of his rights, *Miranda* imposes additional obligations upon them when the defendant chooses to assert his rights. Unless these additional obligations are also satisfied the confession will not be admissible even though it might otherwise be said to be voluntary in traditional terms. As in *Grant,* however, there is no need in this case to determine whether *Miranda* establishes a per se rule prohibiting the police from renewing the interrogation in the absence of counsel once the defendant has requested an attorney. Even if *Miranda* does not absolutely preclude the police from renewing the questioning at an earlier point, *they must at least scrupulously honor the defendant's request for counsel before continuing the interrogation* and that was not done in this case" (emphasis supplied).

Although the fact patterns in those three cases differ, they contain the common thread of failure by the authorities to "scrupulously honor" the suspect's request for counsel. Here, too, as in *Grant (supra,* p 376) "the arresting officer's conduct was completely inconsistent with the defendant's request because he took no steps to afford the defendant an opportunity to obtain an attorney's assistance".

There is the further egregious circumstance here that an Assistant District Attorney "took no steps" to advise the police to honor Aponte's request, and took no steps *on his own* to do so. There can be no excuse for such failure of duty.[6]

In *United States v Hernandez* (574 F2d 1362), the court reversed a conviction even though defendant had never requested counsel but had originally merely invoked his *Miranda* right to remain silent and where, after being given his *Miranda* warnings on two later occasions, finally did make a confession. The trial court in admitting the confession said that the number of times the warnings were repeated prior to the making of the confession was immaterial since " 'it [would] only make him more fully aware of what his rights [were]' " *(supra,* p 1367). In reversing the Court of Appeals said (p 1368): "The more times police inform a suspect of his rights in the face of his repeated invocation of one of those rights—the right to remain silent—the clearer it becomes that the police must not mean what they say. This is exactly the type of subtle coercive pressure which the *Miranda* opinion condemned."

How much more should that be the rule, even if we do not accept the full implications of *Hernandez,* where the defendant not only has three times refused to talk but in addition, as here, has affirmatively asked for the aid of counsel. The prophylactic effect of the *Miranda* rule should not be whittled away or undermined by permitting repeated questioning until the will of the suspect not to answer is fully overcome (see, e.g., *People v Wander,* 47 NY2d 724). Therefore, Aponte's statement should have been suppressed. Without the use of that statement there was no link connecting him to the homicide nor the possession of the gun.[7] His judgment of conviction should therefore be reversed and the indictment as to him should be dismissed as a matter of law.

---

**6.** Had the police and the Assistant District Attorney taken reasonable steps to "scrupulously honor" Aponte's request for counsel, and had Aponte, without solicitation or information from the police tending to weaken his resolve for counsel, waived his right to counsel before counsel actually appeared, we would then be faced with the issue of the appropriateness of a per se rule prohibiting a suspect from waiving his right to counsel after having asserted it (see *(United States v Rodriguez-Gastelum,* 569 F2d 482, cert den 436 US 919).

**7.** The trial court properly instructed the jury not to consider one codefendant's statement as against the other.

II

## THE EVIDENCE AGAINST VALENTINE

Although Valentine also declined to make a statement after he was first given the *Miranda* warnings, he did not request the aid of counsel. As noted, his later statements to the police and to the Assistant District Attorney were induced by Aponte's advice to him that he had given a statement and that Valentine should do so also.

■ Valentine's counsel argues that Valentine's statement was a "fruit of the poisonous tree" of Aponte's illegally obtained statement so that it, too, should be suppressed. That contention lacks merit since Valentine may *not* rely upon the violation of Aponte's constitutional rights to obtain the suppression of his own statement (see *People v Cardaio*, 30 AD2d 843). However, because of Valentine's subsidiary role in the actions of Aponte and the serious question of whether the People met their burden of disproving the defense of justification beyond a reasonable doubt (see Penal Law, §§ 25.00, 35.15; *People v Steele*, 26 NY2d 526, 528), as well as the insubstantiality of proof that Valentine knew of the presence of the weapon prior to the shooting, his conviction should be reversed and the indictment as to him should be dismissed on the law, on the facts and in the interest of justice.

III

## THE IMPROPRIETIES IN THE TRIAL

■ Were we not dismissing the indictment for the above-stated reasons, we would, nevertheless, reverse and order a new trial for the following improprieties:

1. The defendants were entitled to a charge that the failure of the prosecution to call to the stand an eyewitness who had allegedly identified the defendant, gave rise to an inference that the missing witness' testimony would not have been favorable to the prosecution (cf. *People v Rodriguez*, 38 NY2d 95, 101).

It is no answer that identification was not in issue. The justification of the defendants' actions *was* at issue; in fact their whole defense was grounded on self-defense. Clearly, the People would have called Mack to the stand had his testimony

cast doubt on appellants' claim of self-defense.[8] Therefore the failure of the prosecution to have Mack testify gave rise to a possible inference that Mack would not have corroborated the People's contention that Aponte acted provocatively, and not in self-defense.

The fact that Mack was in the courthouse during the course of the trial, having been brought from a house of detention, without counsel for defendants being told of this, constitutes what was properly characterized by the trial court at the time of sentencing, as "[a]t best * * * sharp practice."

Nor do we see any excuse in the fact that the addresses of the two "show-up" witnesses had been provided to the defense. Mack's address was not one at which he could have been found, since he was in jail. Furthermore, the knowledge by defendants' counsel of the witnesses' addresses, or their lack of effort to locate them, does not preclude such a charge (see *People v Moore,* 17 AD2d 57).

The fact remains that even if Aponte's statement had been admissible, this was still a close case. The guilt of defendants depended upon a sophisticated interpretation of the statements of both defendants which were separately given by them without opportunity to have them match. Surprisingly though, they matched in most respects, and both statements *could* be rationally interpreted as showing self-defense. Had the court charged that the People's failure to call Mack to the stand (despite his being brought from his place of incarceration to the courthouse) would permit the jury to infer that his testimony would not have been favorable to the prosecution, the strength of the prosecution's case (borderline as it was as to proof beyond a reasonable doubt) would have been diminished. We cannot say with reasonable certainty that such diminution would still have led to the conviction of defendants.

2. No extended discussion is necessary to demonstrate that the refusal of the trial court to delete the references in

---

8. The impropriety of the "show-up" would have barred Mack's identification of the defendants as being at the scene. Nevertheless he could have described what he saw without identifying the defendants. True, if Mack did not see the actual shooting and he was not permitted to testify as to identity, there would be nothing as to which he could testify. Nevertheless (and especially because he was actually in court and under the physical control of the governmental authorities) the People should have advised defendants' attorneys of his immediate availability for interview. The *least* consequence for this misbehavior is that defendants should have been granted the requested charge.

defendants' statements to their attempted commission of another crime (that they were in the area to get "something to get high") constituted prejudicial error (see *People v Fiore,* 34 NY2d 81, 84). Such statements were not only immaterial, they were completely irrelevant and highly prejudicial. We cannot say that in this closely balanced case (as to reasonable doubt on the issue of self-defense) that no juror was influenced by the thought that people who buy illicit drugs deserve punishment for whatever ensues.[9]

RABIN, J. P., GULOTTA and MANGANO, JJ., concur.

Two judgments of the Supreme Court, Kings County, both rendered February 10, 1978, reversed and indictment dismissed. As to defendant Aponte, the reversal is upon the law; as to defendant Valentine, the reversal is upon the law, the facts and as a matter of discretion in the interest of justice.

This case is remitted to the Supreme Court, Kings County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.

---

9. One further issue merits discussion. Clearly, the "show-up" was improper, since it occurred one month after the shooting and the police had ample opportunity to arrange for a lineup without prejudicial delay to the People's case (see *People v Mercado,* 63 AD2d 720). We may assume that the incarcerated Aponte was ignorant of this fine point of the law, since he had no counsel to advise him.

We may further assume that the knowledge imparted by the police to Aponte that he had been identified had an erosive influence upon Aponte's stated determination that he would not speak without counsel.

Respondent's brief states that: "No Court has yet held that a police officer must take affirmative steps, by gag or otherwise, to prevent a talkative suspect from making an incriminatory statement * * * Furthermore, it does not follow from *Miranda* that an absolute bar to *any* conversation has been established after a request for counsel has been articulated." Nevertheless, this court will not permit the law enforcement authorities, by dilatoriness (whether deliberate or neglectful) or by statements of the strength of the case against the defendant (and a fortiori, legal misinformation as to the strength of the case against him), to weaken an articulated resolve not to furnish a statement until he has had the advice of counsel.