THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
WALTER JENKINS, Appellant.

First Department, March 4, 1982

APPEARANCES OF COUNSEL

*H. B. Comet* for appellant.

*H. B. Wilson, III* for respondent.

OPINION OF THE COURT

MEMORANDUM.

Judgment, Supreme Court, Bronx County (McNAB, J.),
rendered on September 4, 1979, convicting defendant of
robbery in the first and second degrees, and assault in the
second degree (Indictment No. 2129/78), reversed, on the
law and the facts, the indictment dismissed, and the mat-
ter remitted to the trial court for the purpose of entering an
order in favor of the accused pursuant to CPL 160.50, not
less than 30 days after service of a copy of this court's order
upon the respondent, with leave during this 30-day period
to respondent to move and seek any further stay of the
implementation of CPL 160.50 as in the interest of justice
is required; and judgment of said court also rendered on
September 4, 1979, convicting defendant of robbery in the
second degree (Indictment No. 2130/78), reversed, on the

law and the facts, counts 1, 3, 5 and 7 of the indictment dismissed without prejudice, and the case remanded for a new trial on counts 2, 4, 6 and 8.

FEIN, J. (concurring). On October 8, 1978 at approximately 11:00 A.M. defendant was arrested by Officer Blue and another police officer, after a high-speed chase of a reportedly stolen automobile in which defendant was a passenger. When defendant emerged from the vehicle he was holding a rolled up leather jacket. The pockets of the jacket contained an air pistol, four watches, a gold medallion on a chain, about $60 worth of food coupons and $364.15 in cash. On the back seat of the car was a portable television set.

About 25 minutes after arrival at the 32nd Precinct in Manhattan, at "approximately 11:30", Officer Blue delivered *Miranda* warnings. In response to the first *Miranda* warning, defendant stated "Yes, I understand." In response to the remaining warnings, defendant responded "[I]m not going to say anything." Despite this response, Officer Blue asked the defendant questions concerning the source of the automobile, the cash and the food stamps. The officer testified that with reference to the car, "[h]e said he bought the car from a friend." The defendant made no response with respect to the cash and food stamps. Blue could not recall how long he questioned defendant. He thought the questioning took from approximately 11:30 A.M. to 12:00 noon.

At approximately 2:00 P.M. Detective Rosenthal of the Bronx Robbery Squad arrived at the 32nd Precinct. The record is not clear whether Rosenthal was told that *Miranda* warnings had previously been administered to the defendant. Rosenthal testified that he administered *Miranda* warnings shortly after his arrival, in response to which defendant stated: "I don't want to talk to you."

Shortly thereafter, defendant and Rowe, the driver of the stolen vehicle, were taken to the Bronx Robbery Squad in the 48th Precinct in The Bronx, together with the property recovered from the defendant, which appeared to correspond to items stolen in The Bronx that morning. Rosenthal did not recall whether there was any conversation

with the defendant en route to The Bronx. Upon arrival at the Bronx 48th Precinct at approximately 4:30 P.M., defendant and Rowe were each handcuffed to chairs in separate rooms. Sometime between 4:30 and 5:00 P.M. Detective Daino started to question the defendant. He said he was unaware of whether defendant had been questioned by other police officers. He testified as follows:

"Question: Did you have occasion to assist Det. Rosenthal in the questioning of any subject in custody of the Bronx Robbery Squad?

"Answer: Yes.

"Question: On this day?

"Answer: Yes.

"Question: Who, if anyone, did you have a conversation with?

"Answer: With Mr. Jenkins * * *

"Question: What if anything did you say to Mr. Jenkins and what if anything did Mr. Jenkins say to you?

"Answer: This is the Bronx Robbery Squad?

"Question: Yes.

"Answer: I gave Mr. Jenkins his rights under the *Miranda* warning and after giving him his rights I questioned him as to the two robberies that happened on that same day.

"Question: Okay, with regards to the rights under the *Miranda* that you characterize what exactly did you say to Mr. Jenkins and what did he say to you?

"Answer: I told him he had the right to remain silent and that he didn't have to speak unless he wanted to and I asked him if he understood and he said he did. That if he did speak anything he said would be held against him in a court of law and I asked him if he understood and he said he did. I told him he had a right to have an attorney at that time or any time during our conversation and did he understand and he said he did. I said if you can't afford an attorney one will be provided by the court and I asked him if he understood that.

"Question: What did he say?

"Answer: He did."

Manifestly, there was no waiver, either express or by implication, up to this point. Nor was there a request for a waiver. Nevertheless, the inquiry continued. It was made abundantly clear that the questioning would continue until defendant agreed to talk.

"Question: Okay, what, if anything, did you say to the Defendant Jenkins after that and what if anything did the Defendant Jenkins say to you after that?

"Answer: I told him that there were two robberies in two bodegas that day and that certain property had been taken and that he was caught approximately at the time twenty minutes after those robberies down in the 32 Pct. with the property that is described on the UF 61 and that he matched the description and he said at that time he told me, 'I'll talk to you, but I want you to understand one thing I didn't rob any legitimate bodega. These bodegas are not legitimate they sell smoke or they sell numbers.'

"Question: Did the Defendant say anything else to you?

"Answer: He admitted to me that he did rob the store and that Mr. Rowe was with him, but he said Mr. Rowe didn't have any knowledge of what was going on. At that time I stopped and I notified Det. Rosenthal that Mr. Jenkins was talking and Mr. Rosenthal, Det. Rosenthal took over the questioning from that point."

Detective Daino testified that he took no notes of the questions he asked defendant or the answers defendant gave, and that the questioning took approximately 5 or 10 minutes. He was not present during the questioning of defendant by Detective Rosenthal.

The pattern of repeated inquiry was made evident.

Rosenthal testified that at approximately 5:00 P.M. he questioned the defendant on the basis of Daino's report without administering *Miranda* warnings to the defendant. Rosenthal testified, in pertinent part, as follows:

"Question: What did you say, your opening remark?

"Answer: 'I understand you want to make a statement to me.'

"Question: And what was his response?

"Answer: Yes.

"Question: And then you sat down?

"Answer: I sat down.

"Question: And then what did you do?

"Answer: I proceeded to tell him that when we complete the statement, if he gives me a statement, I'll speak to the District Attorney, I can't promise him anything, that for his cooperation I'll let the District Attorney know that he did cooperate, maybe when the time comes the District Attorney might put in a word for him but that I couldn't promise him. The only thing I'll promise him is that I'll speak to the District Attorney.

"Question: At the time that you approached Mr. Jenkins, did you have a pad with you or notebook or —

"Answer: No. Just these papers stapled together.

"Question: Was there any stenographer in the police station at the time?

"Answer: Not that I know of at that time.

"Question: Did you use a tape record at all at the time?

"Answer: No.

"Question: And when you sat down, did you start making notes?

"Answer: Yes.

"Question: At what point did you make your first note? In other words, how long after you started speaking to Mr. Jenkins that you started writing?

"Answer: About three or four minutes.

"Question: And during those three or four minutes, other than telling him that you would intercede for him with the district attorney, if and when he's sentenced, did you say anything else.

"Answer: No, not that I recall."

Rosenthal also testified that defendant indicated he would speak to a District Attorney. According to Rosenthal, defendant stated that he had bought the automobile for $60 "from some kids" who had "changed the plates" and then he and Rowe had driven to the East Tremont section of The Bronx, holding up two grocery stores, one of which defendant had held up the previous Wednesday. Defendant sought to exculpate Rowe. However, Rowe had indicated one reason for holding up the first grocery store was that he needed money for his father's funeral.

At about 6:30 P.M. Assistant District Attorney Weaver arrived at the 48th Precinct and elicited an extensive statement from Rowe, which implicated defendant. Weaver then proceeded to question defendant in the presence of Rosenthal and a stenographer. This interrogation took about one-half hour, after a full advisement and acknowledgment of rights. Defendant thereupon expressed reluctance to give Weaver a statement, afraid that he might become confused and utter something at variance with what he had earlier told the police. At the suppression hearing, Weaver asked to read into the record the transcript of this dialogue with defendant. A portion of it is as follows:

"Question: Basically what I'm asking you right now, did you understand all the rights I have explained to you? Do you want to talk to me about the case?

"Answer: I think its best — I'm not really sure of myself right now — that its best that I prolong this a little bit until I see the attorney so I'll be perfectly clear that I'm not hurting myself.

"Question: Do you understand the rights I read to you?

"Answer: Yes, I do.

"Question: You told me you don't want to talk about the case until you speak to an attorney, is that right?

"Answer: Right, I would like my attorney also to view the statement right there.

"Question: So that we are clear on that you are referring to the two, several sheets of paper?

"Answer: That I actually stated.

"Question: This is what you told the police officer earlier, is that right?

"Answer: Yes, I did.

"Question: Was it written down by one of the police officers?

"Answer: Would it be more official if I signed that?

"Question: You already told me you want to speak to your lawyer?

"Answer: That is correct."

Ignoring defendant's clear statement that he wanted to consult with an attorney, Weaver then went right ahead and questioned defendant about the authenticity of the notes of the oral statement given earlier to Rosenthal. At the suppression hearing Weaver acknowledged that he knew defendant wanted an attorney at that time, but he defended his further inquiry by explaining that he "wouldn't consider it questioning".

A lineup was then conducted, and two witnesses identified defendant (who was still without benefit of counsel). Defendant and Rowe were then returned to the 32nd Precinct where they were formally charged with the October 8 robberies.

The suppression court, in addition to ruling Rowe's statement inadmissible, correctly barred the introduction of the stenographic transcript of Weaver's dialogue with defendant, which was offered as evidence of defendant's confirmation of what he had earlier told Rosenthal. Such confirmation was clearly elicited after defendant had told Weaver that he did not wish to make any statement without first consulting with an attorney. The court also suppressed defendant's statement to Officer Blue at booking, that he had purchased the automobile from a friend, because that statement "came in response to a question at a time when Jenkins had indicated he did not wish to speak". However, the court denied the motion to suppress the oral statements given to Detectives Daino and Rosenthal, on the ground that the defendant had validly waived his "reissued rights prior thereto."

The issue is whether the suppression court properly denied the motion to suppress the statements given to

Detectives Daino and Rosenthal. There is also an issue whether the statement given to Assistant District Attorney Weaver was properly used to impeach the defendant when he took the stand on the trial of the action.

The pattern is clear. Defendant was subjected to repeated importunities in disregard of his rights until he agreed to talk. It cannot be said that defendant knowingly and voluntarily waived his constitutional right against self incrimination and his right to counsel during custodial interrogation.

When defendant told Officer Blue he did not wish "to say anything", the officer persisted in the inquiries as to the source of the car, the cash and the food stamps. Shortly thereafter defendant told Detective Rosenthal, "I don't want to talk to you." Defendant was then turned over to Detective Daino, who administered the *Miranda* warnings, which defendant stated he understood. Without pausing to determine whether defendant waived those rights, Daino launched into a description of the robberies and the apparent identity of the property seized from defendant with that stolen in the robberies. The pressure was on, waiver or no. Once defendant made admissions to Daino, the inquiry was turned over to Rosenthal who took a statement without any warnings. Then followed the inquiry by Assistant District Attorney Weaver, despite defendant's request for an attorney. It was made abundantly clear to defendant that his right to remain silent and his right to the advice of an attorney were being completely disregarded.

Something more than a mere mechanical statement of defendant's rights is required. Most vital to him is a comprehension of such rights and a reasonable opportunity on his part to consider the options available to him so he can make a free and unfettered choice whether to waive his rights without any intervening pressure, cajoling or implied threats.

The touchstone determining admissibility is to be found in *Miranda v Arizona* (384 US 436, 473-474): "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent,

the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."

The question is whether the repeated inquiry here violated the intention of the *Miranda* court to adopt "fully effective means * * * to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored" (*Miranda v Arizona,* 384 US, at p 479). The critical safeguard is a person's "right to cut off questioning" (*Miranda v Arizona,* 384 US, at p 474). The requirement that the law enforcement authorities respect a person's exercise of that option is designed to counteract the coercive pressures of the custodial status. The admissibility of statements obtained after the person in custody has indicated his intention to remain silent depends on whether "his 'right to cut off questioning'" was " 'scrupulously honored' " (*Michigan v Mosley,* 423 US 96, 104). As that case holds, there are circumstances under which further inquiry may be undertaken despite an initial response by the person in custody that he refuses to speak. In that case the circumstance was that one officer questioned the defendant sometime during the morning respecting certain robberies. After being given *Miranda* warnings the defendant refused to speak. Sometime during the afternoon of the same day, in another part of the police headquarters, another officer from a different police force administered the *Miranda* warnings to the defendant and advised him that he was to be questioned concerning a murder, unrelated to the robberies which were the subject of the first inquiry. The defendant indicated that he was willing to respond to questions concerning the killing and he did so, implicating himself and others.

A majority of the Supreme Court of the United States ruled that Mosley's confession respecting the murder was admissible despite the *Miranda* strictures because the inquiry was conducted in another place, by another officer,

concerning an unrelated crime. The court noted that on the second inquiry the questioning officer did not resume interrogation about the robberies respecting which the defendant had refused to talk. The court said (423 US, at pp 105-106): "This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." Nor are the circumstances in this case similar to those in *People v Gary* (31 NY2d 68). In *Gary,* the defendant, in response to *Miranda* warnings administered by a detective at a police precinct, stated that he fully understood his rights and wished to remain silent. No further questions were asked. However, the defendant was transported to another precinct where he was joined by an Assistant District Attorney who again informed the defendant as to his *Miranda* rights. The defendant indicated he was then willing to talk and gave a statement implicating himself in a killing. The court held the statement admissible: "Neither *Miranda* nor any broader constitutional mandate prohibits a subsequent request, made otherwise than in the course of continued importunity or coercive interrogation in the guise of a request for reconsideration." (31 NY2d, at p 70.)

Here, in contrast, there was continued importunity and coercive interrogation in the guise of a request for reconsideration by purportedly independent inquiries by different officers. Each time there was a refusal to speak, a new interrogator pursued the questioning. It was clear that defendant was subjected to harassment until he talked.

Where there is a continuation by successive agencies or otherwise of an interrogation, so that there is no knowing, articulated waiver, the statement obtained must be suppressed (*Westover v United States,* 384 US 436, 496-497, decided with *Miranda v Arizona, supra*). Undoubtedly a

second inquiry may be appropriate if it either relates to a different crime or occurs under circumstances which would indicate that the person being questioned has had an opportunity to reflect and to determine whether he wishes to change his mind and make the statement. However, repeated importunities closely spaced about the same subject matter by different officers in the same precinct or another precinct import all of the elements of the coercive atmosphere against which the *Miranda* rules were designed to insulate.

It is palpable here that the series of inquiries accomplished just that end. Defendant was subjected to the coercive atmosphere and questioned again and again, despite his plain statements at least twice within a short time that day that he wished to remain silent. The technique is obvious. Blue continued the questioning of defendant despite defendant's statement that he did not wish to speak. When defendant made the same response to Rosenthal, the inquiry was turned over to Daino. In response to Daino the defendant indicated merely that he understood the warnings. He was not asked to answer any questions until he was informed that the property found in his possession at the time of his arrest appeared to be the same or similar to that reported to have been stolen from the bodegas. It is manifest that there was no waiver at this point in any event. The questioning began immediately after the defendant indicated he understood the warnings but only after he was told about the bodega robberies, and plainly without any language or other indication of waiver on his part. He obviously knew by then that his previously stated refusal to speak was being systematically ignored. This is particularly apparent from the conversation with Rosenthal who returned immediately after Daino had concluded.

Defendant's admissions or confessions were clearly obtained on the basis of harassment and repeated importunities in a coercive setting. It was plain that defendant was being denied the opportunity to make a free and intelligent choice. The continuity of events following the original *Miranda* warnings demonstrated that the questioning was pursued until there was an admission concerning the rob-

beries. On this record there is no clear showing of an express waiver or of a waiver by implication (*People v Campbell,* 81 AD2d 300, 304). When a defendant is in custody, a heavy burden is cast upon the State to establish that (1) the *Miranda* warnings have been given, (2) the person has an understanding of such rights, and (3) the election to waive them was the result of the voluntary exercise of his own mental processes without outside influences or pressures. It is the duty of the court to indulge every reasonable presumption against waiver of fundamental constitutional rights (*Johnson v Zerbst,* 304 US 458, 464). It follows that such waiver must be carefully scrutinized to determine whether there has been unfairness or whether the statements are the product of the overwhelming pressure of the coercive atmosphere and the repeated importunities. Plainly there was no express waiver here. Nor was there a waiver by implication (*North Carolina v Butler,* 441 US 369, 373) in the light of the fact that defendant's statement was preceded by his several refusals to make a statement and in light of the pressure tactics of the third police interrogator (Detective Daino), which tended to diminish defendant's ability to make a knowing and voluntary determination.

The statements made by Daino concerning the bodega property were made immediately after defendant indicated his understanding of the warnings but before he had made an election to waive. The only inference is that the comments made by the interrogator were for the purpose of introducing "a compelling influence" to produce a waiver contrary to the teachings of *Miranda.* A "waiver of a constitutional right will not be deemed 'voluntary' unless the police have 'scrupulously honored' the suspect's prior assertion of his rights" (*People v Cunningham,* 49 NY2d 203, 207). The statements obtained by Detectives Daino and Rosenthal were procured in violation of defendant's rights, safeguarded by *Miranda,* and specifically the right against self incrimination. "The People have not met the heavy burden placed upon them to show that defendant waived his Fifth Amendment right to remain silent". (*People v Tirado,* 79 AD2d 907, 908; see *North Carolina v Butler,* 441 US, at p 373.).

On this basis, the suppression Judge erred in not suppressing those two statements. Accordingly, there must be a reversal.

Although, under the circumstances of this case, it may be that by invoking his right to remain silent, defendant was also invoking his right to counsel before questioning (see *People v Clark,* 45 NY2d 432; *People v Grant,* 45 NY2d 366; see *People v Buxton,* 44 NY2d 33), we do not reach that question. Nor do we reach the question concerning the use of the statement taken by Assistant District Attorney Weaver to impeach the defendant after the statement had been properly suppressed.

Upon the trial it appeared that three robberies were involved. One was a robbery in a grocery store on October 4, 1978 and the other two occurred on October 8, 1978 (one of which was the same store as was involved in the October 4 robbery). At 10:15 A.M. on the earlier date, Julio and Domingo Perez were in the grocery when three men entered and demanded money. Two were holding revolvers. One struck Julio on the head with a revolver because he did not hand over all the money. Julio was unable to identify defendant as one of the robbers. Domingo was asked whether he saw "anybody in the court room who looks like the people who came into your store and robbed your brother that day?" Domingo answered, referring to defendant, "the only one I see looks like [defendant]."

With regard to the October 8 robbery, Julio Perez testified that he was robbed at 10:30 A.M. on that day. Albert Figueroa, a 14 year old, was working in the store while Julio slept in a back room. Two men entered, one with a gun and the other a stick. The gunman, proceeding to the back room, first told Figueroa to give the money to the other robber who told Figueroa that, if he did not obey, what was done with Julio on Wednesday would be done to him. In the back room, the gunman took from Julio $35 worth of food stamps, a watch and a leather jacket. As they left the store, the robbers took a television set and some beer. Julio Perez was unable to identify defendant. Figueroa could not identify defendant. However, in response to a question whether Figueroa saw anybody in the courtroom "whose appearance is similar to the appearance [of

the gunman]", Figueroa responded that defendant was similar looking except that defendant had shorter hair.

The second robbery on October 8 was of the grocery owned by Carmelo Vasquez, located at 4305 Park Avenue. At 10:45 A.M., Rivera was standing outside the grocery. Two men entered, and one of the men returned and told Rivera that he was wanted inside by the owner. When Rivera entered he saw a man holding a gun on Vasquez. The man took a paper bag containing $1,500. The other robber searched Rivera and another customer, one Febre, from whom he took car keys, a watch and money. Febre did not identify anyone as the robber. Both Vasquez and Rivera identified defendant as the gunman.

Inasmuch as defendant's statements to Detectives Daino and Rosenthal constituted the only evidence of his alleged involvement in the October 4 robbery, the judgment of conviction there must be reversed, and the indictment (2129/78) must be dismissed. The equivocal statement of Domingo Perez referring to the robbers ("the only one I see looks like [defendant]") is insufficient on which to ground a new trial on that indictment. With regard to defendant's alleged involvement in the October 8 robberies, there was other evidence consisting of the fruits of the alleged crime and the identification of defendant by two of the four witnesses. For that day's events, defendant was originally charged in Indictment No. 2130/78 with five counts of robbery in the first degree (counts 1, 3, 5, 7 and 9) and five counts of robbery in the second degree (counts 2, 4, 6, 8 and 10), *inter alia*. At the close of the People's case, the Trial Judge reduced all of the first degree charges to robbery in the second degree. Defendant was then found guilty on the first eight counts, and acquitted on the ninth and tenth. But there never was an accusatory instrument specifying second degree robbery charges on counts 1, 3, 5 and 7. Since we are reversing the conviction on these lesser included counts as well, defendant cannot be retried for the offenses as reduced in those four counts until the People have first obtained a new indictment specifying those reduced charges (*People v Mayo,* 48 NY2d 245; *People v Lediard,* 80 AD2d 237).

SILVERMAN, J. (concurring). I agree with and vote for the result recommended by Justice FEIN.

Defendant, twice given *Miranda* warnings, refused to talk. On the third occasion, Detective Daino gave him *Miranda* warnings, but, before any indication of waiver by defendant, Detective Daino first told defendant of the strong evidence against him. On the totality of circumstances, I think defendant's privilege against self incrimination and his right to cut off questioning were violated. Accordingly his statements were not admissible as part of the People's direct case.

BLOOM, J. (dissenting). This case revolves about three robberies of two bodegas, all committed in Bronx County. One of the bodegas was the subject of separate robberies on October 4 and October 8, 1978. The second was the subject of a robbery on October 8, 1978. Defendant and Johnnie Rowe, his companion, first came to the attention of the police at about 11:00 A.M. on October 8, 1978, when they were observed in upper Manhattan in a blue Lincoln Continental displaying New York registration plates with a New Jersey registration sticker annexed.

The police pursued the vehicle with their dome lights flashing. Almost immediately the Lincoln accelerated. The chase came to an abrupt end when the Lincoln turned the wrong way down a one-way street and came to a halt. Rowe exited from the driver's side of the vehicle and fled. Defendant exited from the passenger side. As he did so he threw a rolled-up leather jacket and an air pistol on the hood of the automobile and said "I give up".

Officer Blue, one of the two pursuing police officers, examined the rolled-up jacket and found a medallion and chain, several watches, food coupons and currency. From the interior of the vehicle Blue recovered a portable television set. Additionally, he found coins scattered over the front seat of the car. Shortly thereafter Rowe was returned to the scene by Detective Williams. The two were taken to the 32nd Precinct where both were searched. Two additional wristwatches were recovered from Rowe.

At the precinct Officer Blue informed both Rowe and defendant of the rights accorded to them by *Miranda v*

*Arizona* (384 US 436). These were read by Blue from the arrest report. To the first right given, i.e., "You have the right to remain silent and refuse to answer any questions; do you understand?" the defendant responded in the affirmative. To each of the others his response was "I'm not going to say anything". Some time thereafter Blue asked defendant where he had obtained the car, the food coupons and the money. To this there was no response other than that he bought the car from a friend.

The Bronx Robbery Squad was notified of the arrest. At about 2 P.M. Detectives Rosenthal and Daino appeared at the 32nd Precinct and defendant and Rowe were turned over to them. Rosenthal repeated the *Miranda* warnings. As he uttered each of the four warnings defendant acknowledged that he understood its purport. At the conclusion of the warnings Rosenthal put the following question to defendant: "Now that I have advised you of your rights, are you willing to answer questions without an attorney present?" To this defendant's response was, "I don't want to talk to you".

Defendant was transported to the 48th Precinct, the headquarters of the Bronx Robbery Squad. At approximately 5 o'clock Detective Daino again read defendant his *Miranda* rights. Daino then proceeded to inform defendant: "that there were two robberies in two bodegas and that certain property had been taken and that he was caught approximately at the time twenty minutes after those robberies in the 32 Pct. with the property that is described in the UF 61 and that he matched the description and he said at that time he told me, 'I'll talk to you, but I want you to understand one thing I didn't rob any legitimate bodega. These bodegas are not legitimate they sell smoke or they sell numbers'". Defendant thereupon admitted to the two robberies of October 8. However, he sought to exculpate Rowe of any involvement in them.

Daino turned defendant back to Detective Rosenthal who was then in the process of questioning Rowe. Rosenthal's introductory statement to defendant was "I understand that you're willing to make a statement as to what happened today as far as the robbery is concerned". When defendant answered in the affirmative Rosenthal told him

that he could not "promise you the world, I'm not going to promise you that you're going to get off with this, but with a little cooperation on your side, I'll go to the District Attorney, I'll tell him that you did cooperate. Maybe when the time comes it might help you a little bit. But other than that, I cannot promise you anything".

Rosenthal did not repeat the *Miranda* warnings which had been given to defendant only minutes before. Defendant proceeded to give Rosenthal a statement in which he made a detailed confession of the three bodega robberies. He told Rosenthal that he met Rowe at 8:00 A.M. that morning. He was driving the car in which he had been apprehended and which he had purchased from some youth for $60. They drove to a bodega located on Crotona Parkway, the same bodega which he had robbed four days earlier. Rowe, the defendant said, was under the impression that they went there to make a purchase. After they had entered the grocery defendant removed a gun from his trouser pocket, went behind the counter, and asked for money. During all of this Rowe remained in the store with a stunned look on his face. Defendant admitted that he had taken all the property itemized in Rosenthal's report.

After leaving the Crotona Parkway store they drove to Park Avenue. There defendant entered another grocery store in which, or immediately adjacent to which, there were four people. The person outside was brought into the store. Again, at gunpoint, he demanded and received money, food stamps and watches. Together Jenkins and Rowe drove to Manhattan where they were apprehended. He also confessed to the robbery of October 4. Rosenthal took notes of defendant's statement. When Jenkins had completed his confession Rosenthal read his notes back to defendant and asked him if they were correct. Defendant acknowledged that they were. However, Rosenthal did not ask defendant to sign or initial the notes.

Following the statement defendant was directed to stand in a lineup at which one of the persons present at the Crotona Parkway robbery of October 8, and one of those present at the Park Avenue robbery made identifications. Figueroa, who was present at the Crotona Parkway robbery, positively identified Rowe while Vasquez, who was

present at the Park Avenue robbery, identified Jenkins. At a *Wade* hearing held subsequently, these identifications were held to be valid.

Assistant District Attorney Weaver, who had been notified of defendant's statement, appeared at the precinct. The stenographic record of his interrogation of Jenkins reflects that defendant was again notified of his *Miranda* rights. This was followed by a dialogue which reads as follows:

"Q. Basically, what I'm asking you right now, did you understand all the rights I have read to you? Do you want to talk to me about the case?

"A. I think it's best — I'm not really sure of myself right now — that it's best that I prolong this a little bit until I see the attorney so I'll be perfectly clear that I'm not hurting myself.

"Q. Do you understand the rights I read to you?

"A. Yes, I do.

"Q. You told me you don't want to talk about the case until you speak to an attorney, is that right?

"A. Right, I would like my attorney also to view the statement right there.

"Q. So that we are clear on that you are referring to the two, several sheets of paper?

"A. That I actually stated.

"Q. This is what you told the police earlier, is that right?

"A. Yes I did.

"Q. Was it written down by one of the police officers?

"A. Would it be more official if I signed that?

"Q. You already told me you wanted to speak to your lawyer.

"A. That is correct."[1]

Thereafter two separate indictments were handed up. The first was against defendant only. That indictment dealt solely with the events of October 4, 1978. Jenkins was charged with two counts of robbery in the first degree,

1. There is some dispute as to whether the transcript as read into evidence by the Assistant District Attorney accurately reflects what was taken down by the stenographer. Acting on the assumption that the version offered by defendant is most favorable to him we accept that version.

three counts of robbery in the second degree, one count of assault in the second degree and two counts of criminal possession of a weapon in the fourth degree. The second indictment encompassed the two robberies on October 8, 1978 and alleged that Jenkins and Rowe, while acting in concert, committed five counts of robbery in the first degree, five counts of robbery in the second degree and one count of criminal possession of a weapon in the fourth degree.

Following the indictments Jenkins and Rowe moved for and were granted an omnibus hearing in which they sought to suppress (1) the physical evidence seized at the time of the arrest by Officer Blue; (2) the lineup and any possible in-court identification by the witnesses who viewed the lineup; and (3) the statements made by Jenkins to Blue, Daino, Rosenthal and Assistant District Attorney Weaver. The court denied that branch of the motion seeking suppression of the physical evidence.

With respect to so much of the motion as sought the suppression of the identifications of the defendant and Rowe, the hearing court dealt individually with the five identification witnesses who had appeared before it. The lineup identification made by Julio Perez, a victim of the October 4 robbery and assault and of the first robbery on October 8 was suppressed on the ground of its uncertainty. For the same reason he was precluded from making any in-court identification. The lineup identification made of Rowe by Albert Figueroa, who was working in the Crotona Parkway grocery at the time of the October 8 robbery, and the in-court identification made by him at the hearing, were held to be valid. As to the robbery of the Park Avenue grocery, the second robbery of October 8, the hearing court held that the lineup and in-court identifications made by Carmelo Vasquez were valid. The photo identification of Rowe made by Jorge Rivera, also a victim of that robbery, from a series of eight photographs was held to be sufficient to enable him to make an in-court identification. However, he was proscribed from making any reference upon the trial to his prior photographic identification. Febre, who was also a victim of the robbery of the Park Avenue bodega, was held to be so confused that his identification

was held to be unworthy of credence. Accordingly, his lineup identification was suppressed and he was precluded from making any in-court identification.

The statement made by Jenkins to Blue was suppressed on the ground that Blue did not readminister the *Miranda* warnings prior to asking about the car. The statement to Weaver was suppressed on the ground that it was made after defendant had stated that he desired to consult with counsel before saying anything further. The statements made to Rosenthal and to Daino were held admissible upon the ground that they were made freely and voluntarily, with full knowledge by Jenkins of his rights, and before any request for counsel had been made.

The two indictments were consolidated for trial purposes.[2] Figueroa, a 14 year old who was helping out in the Crotona Parkway bodega on October 8 and was most definite in his identification of Rowe at the hearing, vacillated at the trial. At one point he testified that he did not see any of the participants in the October 8 Crotona Parkway robbery in the courtroom.[3] The jury separately considered the robberies of October 4 and the two robberies of October 8. With respect to the events of October 4 they found defendant guilty of two counts of robbery in the first degree, three counts of robbery in the second degree and one count of assault in the second degree. The two counts of criminal possession of a weapon in the fourth degree were dismissed by the court. With respect to the events of October 8 the court, prior to submission to the jury, reduced the five counts of robbery in the first degree to robbery in the second degree, thus submitting to them a total of 10 counts of robbery in the second degree. The first six counts dealt with the Park Avenue bodega while the remaining four dealt with the Crotona Parkway bodega. The jury convicted on eight of these counts, acquitting only on the two second degree counts involving Albert Figueroa. The eleventh count, which charged criminal possession of a

---

**2.** To facilitate consideration of the two indictments by the jury the trial court renumbered the counts so that they would read in consecutive order. Because the crimes alleged in these indictments are required to be dealt with separately, we have, for the purposes of clarity, adhered to the original numbering.

**3.** Rowe had pleaded guilty prior to trial and was not in the courtroom.

weapon in the fourth degree, was withdrawn from consideration by the jury.

Defendant urges four separate issues which, he contends, mandate reversal. *First,* he asserts that his answers to Blue and Rosenthal that he would not speak to them, given to each at the time of the administration of the *Miranda* rights, was an invocation of his right to counsel which the police were required to honor and no subsequent waiver of that right in the absence of counsel was valid. Since counsel was not supplied to him at the time of questioning the statements made by him were inadmissible. *Secondly,* he claims that even if his refusal to speak did not call into play his right to counsel, the "repeated" questioning after he had asserted his right to remain silent violated his rights under *Miranda. Thirdly,* and collateral to the first issue raised by him, defendant avers that his right to counsel attached prior to the time he was directed to stand in the lineup. Inasmuch as such representation was not accorded to him during the lineup identification by Vasquez, that lineup identification must be suppressed. *Finally,* he contends that the use, on cross-examination, of the statement made by him to Assistant District Attorney Weaver for the purpose of impeaching his credibility, was improper. We shall treat with these issues seriatim.

## I

Critical to a determination of the first issue tendered is the distinction between the rights protected by the Fifth and Sixth Amendments to the Federal Constitution. The Fifth Amendment assures that no person "shall be compelled in any criminal case to be a witness against himself"; while the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence". The Supreme Court has given additional vitality to the right to counsel by requiring that in all prosecutions for a major criminal offense a defendant who is indigent shall be supplied, free of cost to him, with an attorney (*Gideon v Wainwright,* 372 US 335; *Duncan v Louisiana,* 391 US 145; *Baldwin v New York,* 399 US 66; see, also, *Matter of Hogan v Rosenberg,* 24 NY2d 207, app dsmd and cert den *sub nom. Puryear v Hogan,* 396 US 11).

Defendant's contention that the assertion of the right to remain silent under the Fifth Amendment automatically triggered his right to counsel under the Sixth Amendment flows from the fact that both Blue and Rosenthal, following the litany of *Miranda* rights read to defendant asked him whether he was "willing to answer questions without an attorney present?" To Blue the answer was "I'm not going to say anything"; to Rosenthal the response was "I don't want to talk to you". These answers, contends the defendant, were the equivalent of a flat "no". Jenkins relies on a series of cases decided by the Court of Appeals (*People v Carmine A.,* 53 NY2d 816; *People v Dean,* 47 NY2d 967; *People v Clark,* 45 NY2d 432; *People v Grant,* 45 NY2d 366; *People v Hinton,* 45 NY2d 941), which hold that when an accused has been asked whether he is willing to answer questions in the absence of an attorney and the response by him is "no", questioning must cease until an attorney is present. Under this rule defendant insists that the statements to Daino and Rosenthal must be suppressed.

Had defendant asserted the right to counsel it is plain that under the law of this State the statements to the police officers would have to be suppressed (*People v Rogers,* 48 NY2d 167; *People v Settles,* 46 NY2d 154; *People v Hobson,* 39 NY2d 479; *People v Arthur,* 22 NY2d 325). Indeed, so zealous have our courts been to protect the right to counsel that where a police officer has sufficient reason to trigger the belief that legal representation exists, even though on an unrelated matter, inquiry is mandated and if such inquiry discloses the fact of legal representation, interrogation is precluded in the absence of counsel (*People v Smith,* 54 NY2d 954).

However, none of these authorities are here applicable. Prior to the advent of Weaver upon the scene Jenkins never asserted the right to counsel. He said no more than that he would not answer any questions put to him, an assertion of his Fifth Amendment right. As *Michigan v Mosley* (423 US 96) makes clear, this did not constitute invocation of his Sixth Amendment right to counsel.

In *Mosley* (*supra*), the defendant was arrested and charged with two robberies. After he had been accorded his *Miranda* rights the detective sought to interrogate him.

When Mosley stated that he did not wish to answer any questions about the robberies the interrogation ceased. Thereafter he was turned over to another detective for questioning in connection with a homicide. The court noted (p 97) that the assertion of the right to remain silent did not "indicate a desire to consult with a lawyer".

*Miranda* itself makes evident the distinction between the two rights by requiring that a person charged with crime be notified of his right to remain silent and, in addition, of his right to counsel. If invocation of the right to remain silent automatically triggered the right to counsel, separate notice of the latter right would be unnecessary.

Accordingly, we conclude that defendant did not invoke his right to counsel prior to the completion of his interrogation by Daino and Rosenthal.

## II

Jenkins' second contention is that his statements to Daino and Rosenthal were the result of repeated importunities by the police which reached a point of such harassment that it cannot be said that defendant knowingly, intelligently and voluntarily renounced his right to remain silent and his right to counsel. The hearing court found otherwise and we are in agreement with its conclusion.

The record indicates that Jenkins and Rowe were arrested at or about 11:00 A.M. on October 8. They were transported to the 32nd Precinct, arriving there at about 11:30 A.M. They were advised of their *Miranda* rights and indicated their desire to remain silent. That indication of intention was honored in part. Blue thereafter did ask defendant where he had obtained the car, the food coupons and the money. He received no answer to his question about the food coupons and the money. He was informed that the car had been purchased from a friend. As indicated, that statement was suppressed.

Daino and Rosenthal arrived at the 32nd Precinct at about noon. Rosenthal again informed defendant and Rowe of their *Miranda* rights. When both asserted their right to remain silent no questioning took place. Daino, Rosenthal, Rowe and defendant arrived at the Bronx Robbery Squad at about 2:00 P.M. So far as the record indicates, between

the time of arrival and some time between 4:30 and 5:00 P.M. defendant was placed in a room by himself. Between 4:30 and 5:00 Daino entered the room, again notified defendant of his *Miranda* rights and informed defendant that the property found on him and in the car corresponded to the property taken in the two robberies of October 8 and that he matched the description of one of the robbers. It was at this point that defendant said: "I'll talk to you, but I want you to understand one thing. I didn't rob any legitimate bodega. These bodegas are not legitimate. They sell smoke or they sell numbers".

Thereupon Daino left the room and informed Rosenthal, who was then questioning Rowe, that defendant was ready to talk. Rosenthal proceeded to the room in which defendant was sitting. The statement which was the subject of the motion to suppress was then taken.

In all, approximately three hours elapsed between the time that Rosenthal first administered the *Miranda* rights to defendant at the 32nd Precinct and the admission by defendant to Daino. *Michigan v Mosley* (423 US 96, *supra*) teaches us that assertion of the right to remain silent after a reading of the *Miranda* rights creates no per se rule against further interrogation. An endeavor to interrogate after the lapse of reasonable time is permissible provided that defendant is again apprised of his rights. Indeed, as Mr. Justice WHITE pointed out in his concurrence in *Mosley* (*supra*, p 110), *Miranda* recognized the possibility of a waiver of the right to silence. Some three years prior to *Mosley,* our Court of Appeals had reached the same conclusion (*People v Gary,* 31 NY2d 68).

The only question then remaining is whether Daino waited a reasonable period of time before again approaching defendant. Comparison of the time schedule in this case with that set forth in *Mosley* (*supra*) makes it evident that he did.

## III

Defendant's third contention, that he was not represented by counsel at the lineup, merits little consideration. No judicial proceeding had yet commenced; no accusatory instrument had yet been filed. Since, under *Kirby v Illinois*

(406 US 682), the right to counsel attaches automatically only after the institution of adversary judicial proceedings, and none had yet been here instituted, there was no automatic right to an attorney. No demand for an attorney by defendant was made until after the lineup was held. Hence, no right of defendant was infringed by conducting the lineup in the absence of representation of defendant by an attorney (*People v Blake,* 35 NY2d 331).

## IV

Defendant's fourth contention, that it was improper to permit the Weaver statement, which the prosecution was precluded from using on its direct case, to be used for impeachment purposes is without merit. Defendant testified in his own behalf. His testimony was to the effect that he had spent the night of October 3 through October 4 and the night of October 7 through October 8 at the home of Ms. Sheara Perry in Manhattan and that he had not been in The Bronx either on October 4 or October 8. He testified that he arose at about 9:00 A.M. on October 8, dressed and proceeded north to 125th Street to a grocery store. Having purchased what he came for, he proceeded back toward the Perry residence. At or about 122nd Street he saw a blue late model Lincoln Continental stopped with four or five people standing around it. He watched as the driver of the vehicle emerged and fled and then saw Officer Blue lean into the car and take out a black leather jacket and a gun. Blue then walked over to defendant and directed him to an automobile. When he remonstrated he was handcuffed, pushed into the vehicle and then taken to the 32nd Precinct where Blue gave him his *Miranda* rights. He demanded an attorney and refused to answer any questions. Subsequently, Rosenthal and Daino appeared at the 32nd Precinct, where Rosenthal again informed defendant of his *Miranda* rights. Again, he demanded an attorney and refused to answer questions. Jenkins further testified that he met Rowe for the first time in the 32nd Precinct lockup and that both were transported to the Bronx Robbery Squad office. He insists that he never made any statement to Daino, Rosenthal or Weaver.

On cross-examination questions were asked of him based on the stenographic transcript taken during his interrogation by Weaver. He denied having made the recorded answers. At the request of the prosecutor the Weaver statement was read to the jury with the caveat that the statement was not to be considered by the jury as proof of the truth of anything contained therein, but simply to aid them in determining whether defendant, when he testified in open court, spoke the truth.

Somewhat more than 15 years ago, the rule was announced in this State that while an incriminating statement taken in violation of a defendant's constitutional rights may not be introduced in evidence as part of the prosecutor's case, it is admissible on cross-examination of a defendant on the issue of credibility (*People v Kulis,* 18 NY2d 318). The rule has been subscribed to by the United States Supreme Court (*United States v Havens,* 446 US 620; *Oregon v Hass,* 420 US 714; *Harris v New York,* 401 US 222) and has been followed in this State (*People v Washington,* 51 NY2d 214; *People v McGrath,* 46 NY2d 12; *People v Wise,* 46 NY2d 321).

Defendant urges that Weaver, knowing that counsel had been requested by Jenkins, acted in bad faith. Hence, he argues the rule normally applicable should not be applied in this case. This would require us to find that this prescient prosecutor asked the questions put by him to Jenkins with knowledge that, having made a full confession to Rosenthal, the defendant would go to trial, repudiate his confession *in toto* and present a story so at variance with the answers made to Weaver's questions as to make the stenographic statement admissible.

Laying aside the incredible script proposed by Jenkins, the rationale which sparked the determination in *Kulis* (*supra*) still obtains. A trial remains a search for the truth. Nothing done by a party confers upon the other a franchise to commit perjury. Within the limits imposed by law a jury is entitled to all the evidence which will facilitate its quest for the truth. Hence, the admission of the stenographic statement taken by Weaver, with the appropriate cautionary instruction given by the court, was proper.

## V

There remains an issue not directly treated by defendant to which we are required to address ourselves. That deals with the sufficiency of the proof offered to sustain the indictment dealing with the robbery of October 4. Our brother FEIN is of the opinion that the proof was inadequate. We cannot agree. CPL 60.50 specifies that: "A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed". It is undeniable that the basic underpinning for the conviction which resulted from the events of October 4 was Jenkins' confession. However, the fact "that the offense charged" had been committed was clearly established by the testimony of Julio Perez. Thus, the requirements of CPL 60.50, which mandates independent proof of the corpus delicti, were satisfied. It may be that the equivocal identification by Domingo Perez was insufficient to link defendant with the robbery. However, there is additional proof which ties Jenkins to the events of October 4. There was medical evidence to demonstrate that Julio Perez was severely pistol whipped during that robbery. And there is the testimony of Albert Figueroa that during the October 8 robbery the man who was carrying the stick said to him "that if I don't do what he told me that same thing would be done to me that was done to Julio on Wednesday [October 4]". Clearly, the participants in the October 8 Crotona Parkway robbery knew of the robbery of that grocery on October 4. They were also aware that Julio Perez had been injured in that robbery and, from the words uttered, the manner in which that injury had occurred. While no single piece of testimony may have been sufficient to link Jenkins with the robbery of October 4, all of it taken together, and the inferences reasonably to be drawn therefrom, were sufficient to warrant a finding by the jury beyond a reasonable doubt, that Jenkins was the perpetrator of the October 4 robbery.

For these reasons I would affirm the judgment.

FEIN and SULLIVAN, JJ., concur in an opinion by FEIN, J.;

SILVERMAN, J., concurs in a separate opinion; KUPFERMAN, J. P., and BLOOM, J. dissent in an opinion by BLOOM, J.

Judgments reversed, etc.