Eugene ANDERSON, Appellee,

v.

Harold J. SMITH, Superintendent of Attica Correctional Facility, Appellant.

No. 344, Docket 84–2197.

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1984.

Decided Dec. 18, 1984.

Court, Erie County, the petitioner-appellee, Eugene Anderson, was convicted of felony murder (N.Y.Penal Law § 125.25(3) (McKinney 1975)), attempted robbery in the first degree (*id.* §§ 110.00, 160.15(2)), and possession of a weapon and dangerous instrument (*id.* § 265.02(4) (McKinney 1980) (prior to 1974 amendment codified as § 265.05(2)). After exhaustion of his state remedies, Anderson petitioned for habeas corpus in the United States District Court for the Western District of New York, John T. Elfvin, *Judge.* The district court concluded that petitioner's videotaped inculpatory statement had been elicited in violation of his rights under *Miranda* and *Mosley* and granted the application unless petitioner were afforded within sixty days a new trial in which the confession would not be admitted in evidence. That order was stayed by this court pending resolution of this appeal. We affirm.

Louis A. Haremski, Buffalo, N.Y. (Richard J. Arcara, Dist. Atty., of Erie County, John J. DeFranks, Asst. Dist. Atty., Buffalo, N.Y., of counsel), for appellant.

R. Nils Olsen, Jr., Buffalo, N.Y., for appellee.

Before OAKES and WINTER, Circuit Judges, and CLARIE, District Judge.*

OAKES, Circuit Judge:

This appeal is from a grant of a petition for habeas corpus under 28 U.S.C. § 2254 (1982) on the basis of the failure of police officers to cease interrogation under the strictures of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); and the other decisions of the Supreme Court and this court involving the *Miranda* rules. In a bench trial in the New York Supreme

### FACTS

In the early morning hours of November 19, 1971, Martin Grant, a taxicab driver, was shot near the corner of Jefferson Avenue and Northampton Street in Buffalo, New York. Grant had sustained three flesh wounds in his leg inflicted by a .22–caliber rifle and a fatal head wound from a .16–gauge shotgun.

Buffalo police arrived at the scene at about 2:20 a.m. and began an immediate investigation of the shooting. Homicide detectives received tips indicating that James Ward and Tyrone Powell had been responsible for Martin Grant's death. There was evidence in the trial that, since the death of Martin Grant, James Ward's street name had been changed from "Main Man" to "Sudden Death" and that both the .22–caliber rifle that wounded Grant and the .16–gauge shotgun that killed him belonged to James Ward.

James Ward was picked up on the morning of November 23, 1971, on suspicion of the killing. He and his girlfriend, Gladys Bracey, gave oral statements that same

* Of the District of Connecticut, sitting by designation.

evening implicating his sixteen-year-old brother, Timothy Ward, and petitioner Anderson, age eighteen, and arranged with the police to cooperate in obtaining petitioner's arrest.

As a result, Anderson was arrested at Bracey's home about 11:30 p.m. on the evening of November 23, 1971, as were James Ward and Tyrone Powell. All were advised of their *Miranda* rights by one Sergeant Hunter, and all indicated that they understood those rights. At that time Anderson denied any knowledge of the crime. Anderson, James Ward, and Powell were taken to the homicide department, arriving at approximately 12:10 a.m. Anderson was taken directly to Lieutenant Donovan's inner office. During the next few hours, James Ward and Gladys Bracey each went into the inner office individually to speak privately with Anderson, Bracey having been informed by the police that she could help clear James Ward if Anderson confessed. Bracey later testified, "I told him that if he didn't tell them that he had did it, that I would." Soon thereafter, Lieutenant Donovan went back into his own office with Sergeant Hunter and talked to Anderson, asking him whether he had "anything that you want to tell me now?" According to Sergeant Hunter's testimony, Anderson "slumped in his chair and he put his hand up ..., and he said, 'I done it'. At that time the officers indicated to Anderson that they wanted to put the interrogation on videotape, and at about 3:15 a.m. on November 24, 1971, the videotape interrogation began. Since the conduct of that interrogation is the essence of this case, it will be set out at some length.

First, Lieutenant Donovan read the *Miranda* rights to Anderson and asked if he understood them. He said that he did. The next three questions were:

Q. Now, having these rights in mind, do you wish to talk to us now?

A. To who?

Q. Do you want to talk to me now,

A. No.

Q. What?

A. No.

Lieutenant Donovan continued:

Q. You don't want to talk to me? Why?

A. I done told you already.[1]

Q. Well, I told you I was going to give you an opportunity to talk for yourself, isn't that correct? Now, you have indicated to me that you got something that you want to say?

A. Did I say (unintelligible).

Q. I would like to have you repeat it. Sergeant Hunter from the Homicide Bureau is here, and I am here, and I would like to have you repeat this and tell me what you want to tell me?

A. Okay. I told you that I had something to do with the killing of the cab driver.

Q. Yes.

A. And that I did shoot the man with the rifle.

Q. Yes.

A. And that's all.

Q. Well, don't you want to clarify that by saying what happened or what brought this on?

A. No.

The interrogation continued, eliciting answers to questions about the kind of rifle that Anderson had fired (a .22 automatic sawed-off); whether Anderson knew the cab driver (answered in the negative); whether the driver had ever been seen before (answered "Yes, every day," later changed to "about every other day"); and eliciting that the statement was voluntary and true and that Anderson had graduated from high school. Anderson was asked whether he intended that the cab driver die,

---

1. The transcription of this answer is in dispute. The original transcript recorded Anderson's answer as "I don't know why." However, successive replays of the videotape yielded somewhat different interpretations. The trial judge, the

prosecutor, and Lieutenant Donovan finally decided that he said, "I done told you already." Regardless of what reply is attributed to the petitioner, our analysis remains essentially the same.

and he answered in the negative.[2] A further significant passage of the interrogation is as follows:

Q. When did you decide to off the cab driver?

A. It wasn't decided to off the cab driver.

Q. Well, you didn't tell us why you did it, so that's the only way I can put it, when did you decide to do what finally came down?

A. It wasn't decided. It just—just happened, that's all.

Q. Would you give me a reason why it happened?

A. No.

Q. Eugene, what the Lieutenant is doing, he is not trying to get you to say anything that incriminates you. He is giving you the opportunity to deny—

A. How am I incriminating myself?

Ultimately the officers drew the admission that Anderson had an attempted felony in mind as follows:

Q. But you didn't do it yourself simply because you wanted to shoot somebody?

A. Right.

Q. You had a purpose in mind?

A. Um-hum, yes.

Q. Well, can I ask you this, was it money?

A. No.

Q. Well, that's what I was getting at. I didn't want to imply that you were a mad man, that you just went ape and shot this guy; that there was a reason for it.

A. There is a—supposed to be a robbery.

At trial James Ward and Bracey testified against Anderson and his codefendant Timothy Ward, but the State produced no eye-witness testimony implicating the two defendants. The admission on the videotape that "There is a—supposed to be a robbery" was clearly the most damaging and direct evidence of that fact, the only support for it being James Ward's testimony that Anderson told him that it looked like the cab driver had "a roll" and that they did not get it, meaning the "roll." On cross-examination, however, James Ward testified that Anderson never said anything to him about a robbery. There was no circumstantial evidence introduced as to whether or not Grant's body was found with or without money, whether his pockets were pulled out or disturbed, or whether he was found to have a wallet, nor was there other evidence probative of the attempted robbery.

Petitioner and his codefendant, as above stated, were found guilty by the court of felony murder, attempted robbery in the first degree, and possession of a weapon and dangerous instrument, but they were found not guilty of the intentional murder charge brought pursuant to N.Y.Penal Law § 125.25(1). Anderson was sentenced to indeterminate terms of imprisonment of not less than fifteen years and a maximum of life on the felony murder conviction, not more than ten years on the attempted robbery conviction, and not more than five years on the weapons conviction, all sentences to be served concurrently. The Appellate Division of the New York Supreme Court, Fourth Department, affirmed the conviction on May 18, 1973, by summary order. Discretionary leave to appeal to the New York Court of Appeals was denied by order of the Hon. Matthew J. Jason, Associate Judge, on October 25, 1973. The in-

---

2. Q. Now, let me ask you this. I think it is only fair that you have an opportunity to answer this. Did you intend that this cab driver die as a result of this shooting?

A. Did the cab driver die as a result of my shooting?

Q. Right

A. Or his?

Q. Did you have any idea that this guy was going to die?

A. No, I didn't.

Q. Did you have any intention (unintelligible).

A. No.

Q. Of killing him?

A. No, I didn't.

Q. I mean, do you think that's a fair question to give you an opportunity to say that you didn't intend to do this?

A. Well, I didn't.

stant petition for a writ was filed on February 9, 1982, following Judge Elfvin's issuance of an order granting a petition for a writ of habeas corpus to codefendant Timothy Ward also on the basis of a videotaped statement procured by the police in contravention of the Fifth Amendment right to terminate interrogation. *See Ward v. Smith*, Civ. No. 79–261E (W.D.N.Y. June 12, 1981). Judge Elfvin granted Anderson the writ on May 24, 1984.

## DISCUSSION

As a preliminary matter, we note that Anderson remains imprisoned only for the offense of felony murder, having completed his sentence for attempted robbery in August, 1982, six months after he filed for habeas corpus, and his sentence for weapons possession in August, 1977, four and a half years before he filed his petition. In granting Anderson's petition, the district court does not seem to have considered the two offenses for which Anderson has already completed his jail sentences. However, Anderson's petition broadly challenged as unconstitutional the admission of evidence used in obtaining all three convictions and prayed that the court not only order Anderson's release from custody but also "grant such other and further relief as may seem just and fair under the circumstances." Because we conclude that the district court had jurisdiction to reach the constitutionality of the convictions for weapons possession and attempted robbery, we think that the court below should not have limited its decision to the felony murder conviction.

■ Our jurisdiction over the two convictions for which Anderson has already served his time depends on whether Anderson's challenges to those convictions are moot and whether he satisfies the custody requirement of 28 U.S.C. §§ 2241(c), 2254(a). Clearly, Anderson's challenges are not moot, since a felony conviction carries certain "collateral consequences." *See Carafas v. LaVallee*, 391 U.S. 234, 237, 88 S.Ct. 1556, 1589, 20 L.Ed.2d 554 (1968). For example, a convicted felon cannot obtain a license for some businesses, *see, e.g.*, N.Y.Gen.Bus.Law § 74(2) (McKinney 1968), or serve jury duty, *see* N.Y.Jud.Law § 510(4) (McKinney Supp.1983).[3] Just as clearly, because Anderson was in custody for the attempted robbery at the time he filed his habeas petition, he satisfied the custody requirement. *Carafas*, 391 U.S. at 238–40, 88 S.Ct. at 1559–60. Hence we have jurisdiction to consider the constitutionality of that conviction.

Finally, because Anderson's conviction for weapons possession may lengthen his time in prison, he is "in custody" pursuant to that conviction for purposes of habeas corpus jurisdiction. The courts have long held that a "prior conviction may be invalidated upon federal habeas corpus by a prisoner serving an increased sentence under a second-offender statute." *United States ex rel. Durocher v. LaVallee*, 330 F.2d 303, 306 (2d Cir.) (en banc), *cert. denied*, 377 U.S. 998, 84 S.Ct. 1921, 12 L.Ed.2d 1048 (1964). The Fifth Circuit has logically expanded this jurisdiction to include other cases where invalidation of a prior conviction would shorten the petitioner's present incarceration. *Cappetta v. Wainwright*, 406 F.2d 1238, 1239 (5th Cir.), *cert. denied*, 396 U.S. 846, 90 S.Ct. 55, 24 L.Ed.2d 96 (1969). Here Anderson's conviction for weapons possession presumably will affect the length of time he will remain in jail by affecting the decision of the New York parole board.[4] Before granting pa-

---

**3.** These collateral consequences are immediate. Other collateral consequences may occur in the future. Most notably, if Anderson is later convicted of another crime, his sentence will most probably be increased in light of his earlier conviction. For example, the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 217(a), 98 Stat. 1837 (to be codified at 28 U.S.C. §§ 991–998), makes a marked distinction between first offenders, for whom imprisonment is generally inappropriate, *id.* (to be codified at § 994(j)), and repeat offenders. The Act envisions that a defendant who has committed two prior felonies will be subjected to "a substantial term of imprisonment." *Id.* (to be codified at 28 U.S.C. § 994(i)).

**4.** Of course, when Anderson is released on parole he will still be "in custody." *See Jones v.*

role, the board must consider "the seriousness of the offense," taking into account any "aggravating factors." N.Y.Exec.Law § 259–i(1)(a) (McKinney 1982).[5] Certainly Anderson's contemporaneous conviction for possession of a dangerous weapon aggravated the seriousness of his felony murder conviction, since conviction for felony murder does not require possession of a weapon. *See* N.Y.Penal Law § 125.25(3) (McKinney 1975). We conclude that we have habeas corpus jurisdiction to decide whether or not Anderson's conviction for weapons possession was constitutionally obtained.

◼ We now turn to the merits of Anderson's claims that his videotaped confession was obtained in violation of *Miranda.* The typical *Miranda* case involves one of three issues: whether there is the need for *Miranda* warnings, whether the warnings given were adequate, or whether the suspect effectively waived his rights immediately after receiving the warnings. This case, however, involves so-called "second level" *Miranda* safeguards—the procedures *Miranda* and progeny dictate should be followed after a suspect asserts his rights, to insure that the police do not pressure the suspect to change his mind. *See* Kamisar, *The* Edwards *and* Bradshaw *Cases: The Court Giveth and The Court Taketh Away,* in 5 *The Supreme Court: Trends and Developments 1982–1983,* at 153 (1984) (citing *People v. Grant,* 45 N.Y.2d 366, 371–72, 380 N.E.2d 257, 260, 408 N.Y.S.2d 429, 432 (1978)). Police interrogation is more severely restricted after the suspect asserts his right to counsel than after he asserts his right to silence. *See Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Michigan v. Mosley,* 423 U.S. at 104 & n. 10, 96 S.Ct. at 326 & n. 10. *But see* Kamisar, *supra,* at 157 (arguing that

the level of procedural protection should not depend on which right the suspect invokes, since the same police actions are just as coercive after the suspect invokes one right as after he invokes the other and the suspect typically does not know that the extent of his protection hinges on his choice of rights). Thus, the first question to be asked is what right(s) Anderson asserted when, having been asked, "Now having these rights in mind, do you wish to talk to us now?," he answered, "No, I don't," and to the next question, "What?," he answered again, "No." While the question seems to allude to his right to remain silent, it also refers to "these rights," which presumably would include the right to counsel. Although a good argument can be made that in this case Anderson asserted both rights, *see id.,* he did not expressly ask for a lawyer. We will assume that all that he did was to assert his right to remain silent.

If we proceed on this assumption, what comes into play in determining whether the police acted appropriately is the passage in *Miranda* reading as follows:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Cunningham,* 371 U.S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963). But parole offers a prisoner infinitely greater freedom of action than jail. An effect on the timing of parole is enough of an effect on a prisoner's incarceration to endow us with habeas corpus jurisdiction.

**5.** When the judge, rather than the parole board, has set the minimum sentence, the parole board is directed to consider the factors in N.Y. Exec.Law § 259–i(1)(a). *Id.* § 259–i(2)(c). Here the judge set the 15-year minimum sentence for felony murder pursuant to N.Y.Penal Law § 70.00(3)(a)(i) (McKinney 1975).

384 U.S. at 473–74, 86 S.Ct. at 1627 (footnote omitted), *quoted in Michigan v. Mosley*, 423 U.S. at 100–01, 96 S.Ct. at 324–25. While *Mosley* rejected the literal interpretation of this passage in *Miranda* because it would lead to "absurd and unintended results," 423 U.S. at 102, 96 S.Ct. at 325, the Court did say that "[t]o permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned," *id.* Here there was not even a momentary cessation. Rather, the officer continued, "You don't want to talk to me? Why?" At this point, what Anderson said is in dispute, *see supra* note 1, though we may assume that he said what the trial court ultimately found, "I done told you already." Be this as it may, at the very next question, "Well, I told you I was going to give you an opportunity to talk for yourself, isn't that correct? Now, you have indicated to me that you got something that you want to say?," Anderson initially resisted answering, instead responding with a question, "Did I say (unintelligible)." The lieutenant had to rephrase his question before Anderson answered, "Okay, I told you that I had something to do with the killing of the cab driver." The next question, prompting Anderson to elaborate, was "Yes," and the answer was, "And that I did shoot the man with the rifle," followed again with the question, "Yes," and the unmistakably final answer, "And that's all." Undeterred, the questioner pressed

on with the follow-up question, "Well, don't you want to clarify that by saying what happened or what brought this on?," again eliciting the answer "No."

As stated in *Michigan v. Mosley:*

> A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored ...." 384 U.S., at 479, 86 S.Ct., at 1630.

423 U.S. at 103, 96 S.Ct. at 326. We do not see here how it can be said that Anderson's right of silence was "scrupulously honored." With Anderson at several points seeking to terminate the questioning, the interrogator plowed ahead.[6] The crucial admission that the purpose of the shooting was "[t]here is a—supposed to be a robbery" was not elicited until at least one other attempt on the part of the suspect to terminate questioning.

The State only halfheartedly suggests that Anderson's decision to talk was voluntary because he obviously knew how to invoke his right to remain silent, having done so at the time of his arrest, and "presumably" knew that his right would be respected. This suggestion is patently untenable. Even if Anderson did believe for a time that the police would respect his rights, he could hardly have maintained that belief in the face of Lieutenant Donovan's refusal to accept his silence during the videotape session.[7] Scrupulously hon-

---

**6.** Our decision in *United States v. Collins,* 462 F.2d 792 (2d Cir.), *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972), does not detract from this result. Although the police subjected Collins to several rounds of questioning, they ended every interrogation session as soon as Collins invoked his rights, not to resume until hours later after a new reading of the *Miranda* warnings. Here indisputably the police did not cease their interrogation nor administer fresh warnings prior to their follow-up questions. Moreover, the court *en banc* placed the gloss on *Collins* that "what *Miranda* requires is that 'interrogation must cease' until new and adequate warnings have been given and there is a reasonable basis for inferring that the suspect has voluntarily changed his mind." *Id.* at 802. *Col-*

*lins* anticipates *Mosley*. To the extent that *Collins* is otherwise inconsistent with *Mosley*, it would no longer control.

**7.** Indeed, Anderson must have abandoned this belief even earlier. Although it is unclear whether the police subjected Anderson to interrogation during his first few hours in custody, James Ward and Gladys Bracey pressured him to confess during that time, and Lieutenant Donovan followed up afterward with the question, "Do you have anything that you want to tell me *now?*" (emphasis added) without rereading Anderson his *Miranda* rights as *Michigan v. Mosley* requires. In view of this coercion, the presiding justice at the suppression hearing decided that all statements made by Anderson

oring a suspect's rights for a few hours does not lessen the impact of subsequent coercive questioning. The police must honor the suspect's rights at all times.

The State more cogently argues that "the questioning engaged in by Lieutenant Donovan following petitioner's initial response of 'No' was geared not to guilt or innocence but the procedural question of why petitioner declined to go forward at that moment." In essence, the State contends that Lieutenant Donovan's questioning was not "interrogation" as defined in *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnotes omitted):

> [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

We are referred to the Ninth Circuit's *United States v. Lopez-Diaz*, 630 F.2d 661, 665 (9th Cir.1980), which looks toward a distinction between "an inquiry for the limited purpose of clarifying whether the defendant is invoking his right to remain silent or has changed his mind regarding an earlier assertion of the right" and "questioning aimed at eliciting incriminating statements concerning the very subject on which the defendant has invoked his right." *Innis* apparently prohibits only the second kind of questioning.

The first kind of questioning under the *Lopez-Diaz* distinction refers to two limited situations in which some courts have held that the interrogator can pose certain questions to the accused immediately after the accused has asserted his right to remain silent. First, when it is unclear whether the suspect has indeed invoked his right to silence, the interrogator can ask questions designed to clarify whether or not the suspect intends to talk. *See, e.g., Nash v. Estelle*, 597 F.2d 513, 517 (5th Cir.) (en banc) (suspect's intent unclear when he expressed contradictory desires, "a desire for counsel and a desire to continue the interview without counsel"), *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979); *United States v. Riggs*, 537 F.2d 1219, 1222 (4th Cir.1976) (suspect's statement that he had "no information" could be interpreted "as a mere declaration of ignorance not precluding further cooperation with the investigation").[8] *Miranda* itself approved such clarifying questions. *See* 384 U.S. at 485, 86 S.Ct. at 1633 (quoting with approval statements by the Director of the FBI describing the FBI's interrogation procedures). Here, however, Anderson very clearly invoked his right to silence. When Lieutenant Donovan asked him whether he wanted to talk, he said "no," twice. Indeed, in asking why Anderson refused to talk, the lieutenant implicitly acknowledged that Anderson's decision was clear.

The State urges that *Wilson v. Henderson*, 584 F.2d 1185 (2d Cir.1978), *rehearing en banc denied*, 590 F.2d 408, *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 316 (1979), is precedent for allowing clarifying questions even after the suspect clearly refuses to talk. In *Wilson*, however, the panel majority found the suspect's refusal to make a "statement" not clear but ambiguous; the police had reason to wonder whether Wilson meant only that he would not give a "confession," especially since Wilson might have been expected to offer an exculpatory explanation, having turned himself in. Hence the interrogator's question, "Would you care to tell me what you did on July 4th?," could "fairly be con-

---

before the videotape session were obtained in violation of *Miranda*.

**8.** In *Riggs*, the police continued interrogating Riggs instead of attempting to clarify his intent. Upholding as not clearly erroneous the trial court's finding that Riggs' statement was not only unclear but also more plausibly an expression of his ignorance than an invocation of his rights, the Fourth Circuit concluded that this interrogation did not violate Riggs' rights under the Fifth Amendment. 537 F.2d at 1222. However, the court admonished the police next time to "inquire of the suspect as to the correct interpretation of the statement." *Id.*

strued as an explanation to Wilson that a 'statement' need not be a confession and as an attempt to ascertain the scope of Wilson's refusal to make a 'statement.'" *Id.* at 1188. In the instant case, Anderson flatly refused to talk at all. No latent ambiguity resides in that refusal. We believe it would be unwarranted to extend the holding of the *Wilson* panel to this case.[9] *See United States v. Hernandez*, 574 F.2d 1362, 1369 (5th Cir.1978) (failure to cease interrogation immediately when suspect refused to answer questions violated suspect's right to remain silent). *Cf. Smith v. Illinois*, —— U.S. ——, ——, 105 S.Ct. 490, 491, 83 L.Ed.2d 488 (1984) ("[R]esponses to further interrogation [after the accused has requested counsel] may not be used to cast doubt on the clarity of the initial request itself.").

Second, in addition to allowing clarifying questions, some courts of appeals cases allow interrogators to show the accused the evidence against him and then to ask whether he has reconsidered his decision to remain silent. *See, e.g., United States v. Pheaster*, 544 F.2d 353, 366–68 (9th Cir. 1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977); *United States v. Hodge*, 487 F.2d 945, 946–47 (5th Cir. 1973) (per curiam); *cf. United States v. Guido*, 704 F.2d 675, 677–78 (2d Cir.1983) (citing *Pheaster* and *Hodge* in support of the much more limited holding that an officer did not engage in "interrogation" when he told the suspect details of the crime in response to the suspect's questions); *Unit-*

ed *States v. Boston*, 508 F.2d 1171, 1175 (2d Cir.1974) (no *Miranda* violation when police told accused the results of a search, thereby prompting him to confess), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975). *But see Combs v. Wingo*, 465 F.2d 96, 99 (6th Cir.1972) (showing evidence to an accused who has invoked his right to counsel violates *Miranda* because the only purpose is to elicit a confession); Kamisar, Brewer v. Williams, Massiah, *and Miranda: What is "Interrogation"? When Does It Matter?*, 67 Geo. L.J. 1, 19 n. 115 (1978) (*Pheaster* is inconsistent with *Miranda*). The continued validity of this practice, and hence the weight of those cases, is far from certain after *Rhode Island v. Innis*. Only the Ninth Circuit has expressly tried to square the holding of those cases with *Innis*, suggesting that it is "normally attendant to arrest and custody" for the police to present the accused with the evidence against him. *See United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984); *United States v. Thierman*, 678 F.2d 1331, 1334 n. 3 (9th Cir.1982) (dicta). Even if cases such as *Pheaster* and *Hodge* survive *Innis*, however, they have no bearing here. In this case Lieutenant Donovan showed no new evidence to Anderson after Anderson refused to talk; thus the lieutenant had no reason to suspect that Anderson may have changed his mind and no reason to ask whether he had.

---

**9.** Other differences between *Wilson* and this case also compel this conclusion. Wilson's exculpatory story was "related in narrative fashion and not in response to a series of questions by the officer." 584 F.2d at 1188. Moreover, when the suspect concluded his narrative with the words "And that's all," *id.* at 1187—strikingly like Anderson in this case—Wilson was promptly removed from the interrogation room and the interrogation ceased. *Id.* at 1188. These factors are simply not present in the instant case. The entire interrogation was not in narrative form but in question and answer form. And when Anderson said, "And that's all," the interrogation continued with the direct object to adduce the admission that Anderson intended to rob the cabdriver.

*Wilson* also illustrates the difficulty inherent in applying the exception for clarifying questions in borderline cases. Often judges disagree about whether the suspect's invocation of his rights was ambiguous or whether a given question can properly be classified as "clarifying." Several borderline cases, including *Wilson* itself, *see* 584 F.2d at 1192 (Oakes, J., dissenting); 590 F.2d at 408 (Oakes, J., dissenting from denial of rehearing en banc), have provoked strong dissents. *See also Nash v. Estelle*, 597 F.2d at 520 (Godbold, J., dissenting); *United States v. Rodriguez-Gastelum*, 569 F.2d 482, 488 (9th Cir.1978) (en banc) (Goodwin, J., concurring and dissenting). The potential to erode *Miranda* and *Mosley* by allowing unceasing interrogation under the guise of clarification cautions against permitting clarifying questions too freely.

Therefore, the distinction articulated in *Lopez-Diaz* is inapposite in this case: Lieutenant Donovan did not have cause to ask Anderson either whether he meant to invoke his rights or whether he wanted to reconsider his decision to invoke them. Still less did he have cause to ask Anderson *why* he refused to talk. The interrogator never needs to know why a suspect wants to remain silent; once it is clear that the suspect wants to remain silent, the interrogation should cease. After all, the Fifth Amendment assumes that the suspect invokes his right in order not to be a witness against himself; that is reason enough. An interrogator would only want to probe beyond the suspect's presumed desire to avoid self-incrimination if he expected. either to evoke an incriminating response or to get a clue as to how the suspect might be persuaded to abandon his rights. Indeed, Lieutenant Donovan's question "You don't want to talk to me? Why?" apparently fulfilled both those expectations. We assume that Anderson replied, "I done told you alrady." [10] Itself an incriminating confirmation of Anderson's earlier admission of guilt, this reply showed the lieutenant exactly how to wear down Anderson's resolve not to talk; Anderson already believed that his earlier admission had done him in, and needed only to be convinced of a reason to repeat it. The lieutenant capitalized on this new knowledge immediately, stating, "I would like to have you repeat it. Sergeant Hunter from the Homicide Bureau is here, and I am here, and I would like to have you repeat this and tell me what you want to tell me?" Out-argued, Anderson gave in.

In short, the police should have realized that asking Anderson why he refused to talk was "reasonably likely to elicit an incriminating response," *Rhode Island v. Innis*, 446 U.S. at 301, 100 S.Ct. at 1689. Far from being "merely a procedural follow-up," as the State suggests, this question violated Anderson's right to remain silent.

The State's fallback argument is that even if it was erroneous to admit the video-tape statement, to do so was at most harmless error. The State argues first that other trial testimony amply supported conviction: James Ward and Gladys Bracey both testified that Anderson had admitted his participation to them, and defense counsel elicited on cross-examination of Sergeant Hunter the statement that prior to the videotape, when asked "Well, how do you feel now? Do you have anything that you want to tell me now?," Anderson said, "I done it," and in reply to the question "You said what?," he said, "I done it." Second, the State contends that the district court failed to accord the state court's determinations of Ward's and Bracey's credibility the "high measure of deference," *Sumner v. Mata*, 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982), required by 28 U.S.C. § 2254(d) ("a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction ... shall be presumed to be correct").

But the sufficiency of the evidence is irrelevant to our determination whether admission of the videotape was harmless constitutional error under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and progeny, a subject that we have explored in some depth not too long ago in *Kampshoff v. Smith*, 698 F.2d 581 (2d Cir.1983). The question is not whether there is legally "sufficient evidence [of guilt] on which the accused could have been convicted without the evidence complained of." *Fahy v. Connecticut*, 375 U.S. 85, 86, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). Indeed, even if a court considers the evidence overwhelming, it should not automatically assume that a constitutional error is harmless. *See Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *Chapman*, 386 U.S. at 23, 87 S.Ct. at 827. The test rather is simply whether "there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." *Schneble v. Florida*, 405 U.S.

**10.** *See supra* note 1.

427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972); *accord Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

■ Here we think there was such a "reasonable possibility." On the videotape, Anderson admitted that he shot Grant with a .22 and that the murder occurred during the course of a robbery. It would be hard to say that such explicit admissions did not contribute to his convictions for weapons possession and attempted robbery. The robbery admission was also crucial evidence supporting the felony conviction; in order to find Anderson guilty of felony murder, the court had to find that he either committed or attempted to commit robbery. *See* N.Y.Penal Law § 125.25(3).

Though perhaps sufficient to support conviction, the other evidence certainly fell far short of being overwhelming enough to negate the detrimental effect of the videotape. The other evidence on weapons possession was somewhat thin—for example, the police found no fingerprints on the .22. More critically, evidence going to the robbery motive was almost nonexistent. James Ward's testimony that petitioner told him that "he looked like he had a roll" and that "they didn't get it" is to some extent offset by his admission on cross-examination that he did not recall Anderson's having said anything about a robbery of Grant. Aside from his statement, no other evidence about the robbery was introduced against Anderson. Not only was there no circumstantial evidence or eyewitness testimony, but Gladys Bracey's testimony concerning Anderson's statements was silent as to any admissions probative of this issue. The testimony of the Sergeant elicited on cross-examination regarding Anderson's oral inculpatory statement preceding the challenged videotape adds little to his evidence.[11] That statement, "I done it," repeated twice, is no more than a very brief, general, nonspecific admission that Anderson was involved in the shooting. It lacked any specificity as to what he was admitting he had done; it certainly made no reference whatsoever to the crucial ele-

ment that Anderson intended to commit a robbery.

The federal district court's finding that James Ward's and Gladys Bracey's testimony was of questionable validity also need not delay us here. Ward's testimony certainly involved some self-interest, particularly since there was evidence that the guns involved were his and that he was walking his dogs nearby at the time of the shooting. Not without bearing is the fact that Ward's street name evidently changed from "Main Man" to "Sudden Death" after the shooting, and that he was originally a primary suspect in the murder. Although Bracey was never implicated in the crime, her relationship with Ward and her desire to protect him similarly detract from the credibility of her testimony. Neither these comments nor the district court's in any way disregard the rule of the Supreme Court cases and the statute regarding the sanctity of state court findings. We repeat that we are here seeking to determine whether the constitutional error was harmless, not to determine whether there was sufficient evidence to support the verdict. Where, as here, the judge makes no specific credibility findings, we must speculate how much weight he accorded different evidence to determine the harm done by the erroneously admitted evidence.

The fact that this was a bench trial is irrelevant. True, a judge conducting a bench trial can hear evidence that he ultimately determines to be inadmissible without prejudice to his verdict. Here, however, the statement was accepted into evidence, and it was considered to be relevant and probative, so that the judge had no reason to ignore or discount it as evidence. We are required to conclude that the admission of the videotape was not harmless constitutional error.

We affirm the district court's judgment granting release from custody unless Anderson receives within sixty days a new trial for felony murder, the offense for which Anderson is now incarcerated. How-

---

**11.** This statement would have been suppressed on direct examination. *See supra* note 7.

ever, we remand to the district court to determine the appropriate relief from the unconstitutional convictions for attempted robbery and weapons possession.

Judgment affirmed in part and remanded in part.